**UNITED OVERSEAS BANK**

v.

**VENEERS, INC.**

**Civ. No. 21066–B.**

United States District Court,
D. Maryland.

Oct. 10, 1973.

On Motion for Summary Judgment
May 9, 1974.

Michael P. Crocker, Baltimore, Md., for plaintiff.

Nathan Patz, Baltimore, Md., for defendant.

BLAIR, District Judge.

## MEMORANDUM AND ORDER

Plaintiff, United Overseas Bank, a Swiss corporation, filed this suit under the diversity jurisdiction of the federal courts, 28 U.S.C. § 1332, seeking to recover from defendant, Veneers, Inc., a Maryland corporation, on a bill of exchange dishonored by Veneers. The case is presently before the court on cross-motions for summary judgment. The facts which are undisputed and are important for consideration of the motions are found in the record and include affidavits by Pierre Jeandin, Director of United Overseas Bank, and Montgomery P. Adams, Operations Officer of Maryland National Bank, as well as answers to interrogatories and responses to requests for admissions of fact by both parties.

On or about May 16, 1968, Madera S. A., a corporation with a banking account in United Overseas Bank, presented to United Overseas Bank for collection a bill of exchange drawn by Madera with Madera as payee and Veneers as payor. As requested by Madera, United Overseas forwarded the bill of exchange to Maryland National Bank in Baltimore for presentation to and acceptance by Veneers. The bill of exchange called for the payment by Veneers to the order of Madera of $42,478.40 on July 21, 1968. Upon its receipt by Maryland National Bank in Baltimore the bill of exchange was presented to Veneers for acceptance. On May 24, 1968, John Williamson, President of Veneers, signed the printed acceptation form on the bill of exchange, signifying that Veneers had accepted it for payment at Maryland National Bank, Baltimore, Maryland, on July 21, 1968.

The accepted bill of exchange remained in the hands of Maryland National Bank which, on May 31, 1968, forwarded a notice to United Overseas that Veneers had accepted it for payment on July 21, 1968. On June 7, 1968, United Overseas, acting on the notice that Veneers had accepted, discounted the bill by making available for Madera's imme-

diate withdrawal $41,853.88. On July 22, 1968, the bill of exchange was presented by Maryland National Bank to Veneers for payment. Veneers, however, refused to honor it, asserting that Madera was indebted to it on a separate account (apparently in the amount of $36,941.72) and that Veneers would not honor the bill of exchange until Madera had settled this account. That same day, July 22, Maryland National Bank protested the nonpayment and had notices of the nonpayment sent to Veneers, United Overseas Bank and Madera. A series of telex interchanges between Maryland National Bank and United Overseas Bank ensued. When it became obvious to United Overseas that Veneers was not going to pay the bill of exchange, it enlisted the aid of its parent, Bank of America, which retained counsel to press the matter in the courts. On July 29, 1969, on the advice of counsel, United Overseas, through its Director, Pierre Jeandin, placed a collection bank endorsement upon the back of the bill of exchange. Until that time, the bill of exchange had upon it no endorsement whatsoever. United Overseas affixed the endorsement in the belief that it, as a collection bank, was entitled to place its depositor's endorsement upon negotiable instruments placed with it for collection. Until sometime before United Overseas affixed the collection endorsement in Switzerland, the bill of exchange had been in the possession of Maryland National Bank in Baltimore, Maryland. It should be noted at this point that the endorsement by United Overseas was placed upon the bill of exchange approximately one year after it had been dishonored by Veneers. At a time shortly after United Overseas received notice of acceptance by Veneers but before it received notice of dishonor, Madera availed itself of the cash credit on hand in United Overseas Bank and withdrew the money. Apparently Madera is bankrupt and there is little hope of collection from Madera of either the

amount Veneers alleges is due it or the amount which is in question in this present suit.

Until it received notice of the dishonorment by Veneers, United Overseas had no knowledge of any claim of Veneers against Madera and at the time it made credits available for withdrawal by Madera, it was under the confirmed impression that Madera was a solvent, viable concern. Madera had done banking business with United Overseas for a period of years and the transaction leading to this suit was not a single isolated transaction but was done in the normal course of business with a regular customer of the bank.

### I.

The foreign plaintiff, United Overseas, argues that Maryland law governs the resolution of the suit. The domestic defendant, Veneers, maintains that Swiss law is applicable.

Veneers' position, in substance, is that the significant portions of the transaction, and especially those upon which United Overseas relies, have contacts with Switzerland and Swiss law must be looked to by the court. According to an affidavit filed on behalf of Veneers, under the Swiss Code of Obligations, an endorsement to be effective must be made manually and must be signed by the endorser on the reverse side of the negotiable instrument or upon a sheet attached thereto. The affiant, a Swiss attorney, certifies as accurate the following translations of the Swiss Code of Obligations, Article 1003 and Article 1085, in effect in Switzerland in the years 1968 and 1969: [1]

### Article 1003

The endorsement must be made on the bill of exchange or on a sheet attached to the bill of exchange. It must be signed by the endorser.

The endorsement need not name the endorsee and may simply consist of

---

[1]. Provisions similar in some respect exist in the Uniform Commercial Code, Annotated

Code of Maryland, Article 95B, § 3-202(2). *See infra.*

the signature of the endorser. In this latter case, in order to be valid, the endorsement must be made on the reverse side of the bill of exchange or on the attached sheet.

### Article 1085

Contracts on bills of exchange must bear the handwritten signature of their signatories. The handwritten signature cannot be replaced by mechanical facsimiles or marks made by hand, even if legalised or officially attested. The signature of a blind person must be attested.

It is affiant's opinion that the typewritten endorsement, placed by United Overseas upon the bill of exchange on July 29, 1969, was not in conformity with Swiss law and would convey to United Overseas no right, title or interest in the negotiable instrument.

The Swiss plaintiff, conversely, argues that the Uniform Commercial Code of Maryland is the governing law. It contends that under the U.C.C. it does have title to the instrument and is a holder in due course immune from the defenses Veneers could assert against Madera.

Sitting in diversity, this court is bound to apply the law which the state courts would apply when confronted with a choice of law question. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U. S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The applicable conflicts rule is found in the Maryland U.C.C. which states:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this article applies to transactions bearing an appropriate relation to this state. Annotated Code of Maryland, Art. 95B, § 1–105(1).

This court is aware of no Maryland decisions to date interpreting this provision in general or as it applies to negotiable instruments.

The Maryland Court of Appeals, nevertheless, has spoken on negotiable instruments choice of law in John Hancock M.L. Life Ins. Co. v. Fidelity-Balt. Nat. Bank & Trust Co., 212 Md. 506, 129 A. 2d 815 (1957), a pre-U.C.C. case. There, Wright, the manager of the Baltimore office of John Hancock Mutual Life Insurance Company, a Massachusetts company, sent to the home office in Massachusetts fraudulent claims on behalf of non-existent policyholders. John Hancock drew checks in the Massachusetts office payable to the fictitious policyholders and forwarded them to Wright in Maryland for distribution to the claimants. Wright, on receiving the checks, endorsed the fictitious payees' names and cashed them in Baltimore banks. Under Massachusetts law, checks payable to fictitious persons were bearer paper and required no endorsement for transfer but, under Maryland law, such checks were not bearer paper and required a proper endorsement for transfer. Maryland law, therefore, regarded the endorsement of a fictitious payee's name as a forgery and placed liability upon a bank cashing a check bearing a forged endorsement; Massachusetts law exempted the bank cashing the check from liability since the instrument was bearer paper. The court observed that delivery of a check was essential under both Maryland and Massachusetts law before it became a binding contract. It concluded that the checks were not delivered when sent to Wright because, as John Hancock's employee, Wright was subject to its control and John Hancock could have instructed him to withhold any further delivery. The court found that the checks were not delivered until presented to the Baltimore banks and negotiated for value. Because the checks were delivered and negotiated in Maryland, the court held Maryland law governed the transaction.

■ While § 1–105 may appear at first glance to compel the application of the U.C.C. anytime a transaction has an "appropriate relation" to the forum, even though another state or nation may have a more "appropriate relation", such a restrictive, forum oriented interpretation is not warranted. The comments reveal that

> Where a transaction has significant contacts with a state which has enacted the Act and also with other jurisdictions, the question what relation is "appropriate" is left to judicial decision. § 1–105, Official Comment 3.

Were the forum court to apply the U.C.C. to every transaction having minimal contacts with the forum, the result would be increased forum shopping among litigants and that foreign courts, not bound by the full faith and credit clause, may be reluctant to honor a judgment rendered by an American court. Most commentators argue against forum oriented interpretation and in favor of a more analytic choice of law approach. *See*, Siegel, "The U.C.C. and Choice of Law: Forum Choice or Forum Law", 21 Am.Univ.L.Rev. 494 (1972); Nordstrom and Ramerman, "The Uniform Commercial Code and The Choice of Law", 1969 Duke Lw.Journal 623; *Note*, "Conflicts of Laws and the "Appropriate Relation" Test of Section 1–105 of the Uniform Commercial Code", 40 George Wash.L.Rev. 797 (1972). This court, accordingly, does not feel bound to apply the U.C.C. to this transaction, but shall look for guidance to judicial choice of law principles in an effort to determine whether the instant transaction bears an "appropriate relation" to Maryland.

■ The common choice of law rule regarding negotiable instruments is that the law of the place where the negotiable instrument is physically located at the time it is transferred governs the validity of the transfer as between individuals not both parties to the transfer and whether the transferee becomes a holder in due course. Restatement of the Law Second, Conflict of Laws 2nd, Vol. 1, § 216 (1969). Leflar, American Conflicts of Law, § 155 (1968); *see, e. g.*, United States v. Guaranty Trust Co., 293 U.S. 340, 55 S.Ct. 221, 79 L.Ed. 415 (1934); Heating Acceptance Corp. v. Patterson, 152 Conn. 467, 208 A.2d 341 (1965). This principle has been applied and, although not directly enunciated therein, is certainly consistent with and supported by the ruling in John Hancock M. L. Ins. Co. v. Fidelity-Baltimore, 212 Md. 506, 129 A.2d 815 (1957). Indeed, counsel for both parties in this case agreed at the hearing on the motions for summary judgment that this principle is applicable to the transaction. The parties disagreed, however, as to where the instrument was located when the transfer took place.

■■ United Overseas contends the transfer occurred when it gave value to Madera, at which time the bill of exchange was in Baltimore in the hands of Maryland National Bank. Veneers' position is that the transfer was unsuccessfully attempted in 1969 when the instrument was in Switzerland at the time the endorsement was placed upon the bill by United Overseas. Veneers asserted that under Swiss law, the endorsement was ineffective and transferred no title or interest to the plaintiff. The question for decision is whether a transfer occurred and if so when. Clearly, if an endorsement is required for transfer, the instrument was in Switzerland at the time it was placed upon the bill; if an endorsement is not required for a transfer, provided value is given, the instrument was in Maryland. Under Maryland law, a bank which advances value upon a negotiable instrument has a security interest in the instrument and can be a holder in due course, other conditions existing. Annotated Code of Maryland, Art. 95B, § 4–208 and § 4–209. Suit & Wells Equip. Co. v. Citizens National Bank of So. Md., 263 Md. 133, 282 A.2d 109 (1971). When plaintiff advanced value on the bill of exchange on June 7, 1968, it was in Maryland and the court concludes that the transfer occurred in Maryland. In addition to the

transfer occurring in Maryland, the court notes without enumeration that there were many significant contacts between the transaction, the parties thereto and the State of Maryland. The transaction bears "an appropriate relation" to Maryland and the validity and effect of the transfer shall be determined under the Maryland Uniform Commercial Code.

## II.

What must now be determined is what the effect of the transfer was and whether, under the U.C.C., plaintiff became a holder in due course.

■ The requirements for becoming a holder in due course are set out in § 3–302, which provides:

(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

The court reads this section to mean that one must become a holder in order to become a holder in due course. Cheshire Commercial Corp. v. Messier, 6 Conn.Cir. 542, 278 A.2d 413, 415 (1971); Northside Building & Investment Co. v. Finance Co. of America, 119 Ga.App. 131, 166 S.E.2d 608, 611 (1969); Wright v. Bank of California, 276 Cal. App.2d 485, 81 Cal.Rptr. 11, 13 (1969); Citizens National Bank of Englewood v. Fort Lee Savings & Loan Assn., 89 N.J. Super. 43, 213 A.2d 315, 317 (1965); Hawkland, "Depositary Banks as Holders in Due Course", 76 Commercial Law Journal 124 (1971).

■ The definition of holder is provided in § 1–201(20), which states:

"Holder" means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank.

Section 3–202 then provides:

(1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery.

(2) An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof.

Since the endorsement must be written on the instrument unless it is bearer paper, § 4–205(1) empowers a depositary bank taking an item for collection which is payable to order to supply the depositor's endorsement and thereby become a holder eligible for holder in due course status. Central Bank and Trust Co. v. First Northwest Bank, 332 F.Supp. 1166 (E.D.Mo.1971); Pazol v. Citizens National Bank of Sandy Springs, 110 Ga. App. 319, 138 S.E.2d 442 (1964). See also, Security State Bank v. Baty, 439 F.2d 910 (10th Cir. 1971); Hawkland, "Depositary Banks as Holders in Due Course", 76 Commercial Law Journal 124 (1971). From these provisions, it can be seen that a depositary bank becomes a holder when it receives an instrument endorsed to it, to bearer, or in blank or when it adds its depositor's endorsement to the instrument received. Unless the instrument is taken by negotiation, a depositary bank does not become a holder and *a fortiori* cannot be a holder in due course. § 4–209.

■ In the present case, plaintiff could not have become a holder until July 29, 1969, when it placed a depositary bank endorsement upon the bill of exchange, as it was authorized to do under § 4–205(1). Plaintiff was not a holder at the time it gave value because at that time it had not procured or placed an endorsement upon the bill of exchange which was payable to order although plaintiff obtained a security interest in the instrument, § 4–208, on June 7, 1968 when it gave sufficient val-

ue to become a holder in due course were it first a holder. § 4–209 and § 3–302. Thus, plaintiff's status as a holder in due course is measured from July 29, 1969. Before that date, however, plaintiff had knowledge of the claim against Madera and could not take the instrument "without notice that it is overdue or has been dishonored or of any defense against . . . it on the part of any person." § 3–302(1)(c). Not achieving holder in due course status, plaintiff's rights on the bill of exchange are subject to the claims or defenses of defendant against Madera. § 3–306.

In reaching this conclusion, the court is aware of but not persuaded by the First Circuit's contrary holding in Bowling Green, Inc. v. State Street Bank & Trust Co., 425 F.2d 81 (1st Cir. 1970). In that case, the plaintiff, Bowling Green, for the purchase of bowling equipment, endorsed to Bowl-Mor a check it had received from the Small Business Administration on a small business loan. Bowl-Mor deposited the check in its account in the State Street Bank & Trust Co. and was given immediate credit against an overdraft existing at the time of deposit. Bowl-Mor subsequently was adjudicated bankrupt, never having delivered the purchased equipment to Bowling Green. The remaining proceeds of the check were applied by the bank to the balance of Bowl-Mor's loan account after the bankruptcy petition was filed. Bowling Green then sued the bank for the return of the funds represented by the check, and the bank countered that it was a holder in due course. No evidence whatsoever was presented at trial as to how or whether Bowl-Mor endorsed the check it deposited, the only evidence being that Bowling Green had endorsed the check, although it is not clear whether Bowling Green endorsed the check in blank or specially. *See* § 3–304. Plaintiff argued that, absent the endorsement, the defendant could not be a holder and hence could not be a holder in due course. The district court disagreed, found that defendant was a holder in due course, and held that it was not necessary for a depositary bank to take an item by negotiation to become a holder in due course. Bowling Green, Inc. v. State Street Bank & Trust Co., 307 F. Supp. 648 (D.Mass.1969).

The First Circuit in affirming expressed doubt that the definition of holder in § 1–201(20) applied with full force to Article 4, noting that Article 4 governed if inconsistent with Article 3. The court stated that, although § 4–209 required a bank to comply with § 3–302 to become a holder in due course, this meant only that the bank had to comply with the requirements of good faith and lack of notice and did not demand that the bank be a holder, something, the court stated, § 3–302 assumed rather than required. Recognizing that banks often accept unendorsed checks, the court noted that § 4–205(1) empowered the bank to supply a missing endorsement as a matter of course, but doubted that the bank's status should depend on whether a clerk stamped the instrument, at least in a situation where the depositor himself was a holder.

The *Bowling Green* case was followed in Nida v. Michael, 34 Mich.App. 290, 191 N.W.2d 151 (1971), where the court observed that a payee was also a holder and a depositary bank need not obtain or apply a payee's endorsement to be a holder in due course. Despite these judicial decisions, the critical commentary has been adverse, and has pointed to a failure to follow the clear provisions in the statute. *See, e. g.,* Hawkland, "Depositary Banks as Holders in Due Course", 76 Commercial Law Journal 124 (1971); *Note, "Bowling Green:* The Bank as a Holder in Due Course", 71 Columbia Law Review 302 (1971); *Note,* "Commercial Banking—How Can a Bank Become a Holder and Give Value in Order to Attain Holder in Due Course Status?—Bowling Green, Inc. v. State Street Bank & Trust Co.", 12 Boston College Law Review 282 (1970). This court, too, finds the interpretation given in *Bowling Green* to be inconsistent with the statute's clear language and declines

to apply such an interpretation to the Maryland U.C.C. in this case in the absence of any authority by Maryland courts to support such a construction.

Section 4–209 provides that a bank which gives value may, on complying with § 3–302, become a holder in due course. Section 3–302 has as a pre-requisite the requirement that a holder in due course first be a holder. There is nothing in § 4–209 which abates or eliminates or is in any way inconsistent with this requirement of § 3–302. In this court's opinion, all the requirements of § 3–302, and not just select ones as indicated by the *Bowling Green* court, apply to depositary banks.

■ Section 4–205 permits a depositary bank, defined in § 4–105(a), to place its depositor's endorsement on items. It provides:

> A depositary bank which has taken an item for collection may supply any indorsement of the customer *which is necessary to title* unless the item contains the words "payee's indorsement required" or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement. (Emphasis added).

As the emphasized language indicates, this section contemplates that the depositor's endorsement is necessary for title. It permits the bank to place this endorsement upon an item by a simple, routine banking entry. The comments state that the bank is given this authority to "speed up collections by eliminating any *necessity* to return to a non-bank depositor any items he may have failed to indorse." (Emphasis added) § 4–205, Official Comment. The contemplation of the comment is that, absent § 4–205's grant of authority to endorse, it would be necessary for a depositary bank to obtain the depositor's endorsement. Nothing in this section or the comments indicates that a depositary bank need not comply with endorsement requirements incident to the negotiation of "order" paper if it seeks to be a holder. The purpose of the section is to permit the bank, in the interest of expediency for both the bank and its customers, to supply what the bank could have required the customer to supply initially. Had § 4–205(1) been intended to eliminate the need for an endorsement to obtain holder status, it would have been a simple matter for the drafters of the code to have provided in explicit language that a depositary bank is a holder whether or not it secures its depositor's endorsement, rather than providing that a depositary bank may add an endorsement "necessary to title."

■ The code makes different provision for parties not having the status of depositary banks. Section 3–201(3) gives such a party who provides value for a negotiable instrument payable to order an absolute right to obtain a court order requiring the transferor to endorse the instrument. Northside Building & Investment Co. v. Finance Co. of America, 119 Ga.App. 131, 166 S.E.2d 608 (1969). Courts have required non-depositary bank parties to secure an endorsement to become a holder. Cheshire Commercial Corp. v. Messier, 6 Conn. Cir. 542, 278 A.2d 413 (1971); Northside Building & Investment Co. v. Finance Co. of America, *supra*. The right of a depositary bank to affix the missing endorsement without the necessity of seeking a court order is explainable on the grounds of expediency and convenience rather than as support for the proposition that depositary banks need not affix an endorsement to become a holder in due course. To require a bank to secure a court order to obtain an endorsement would impose a time consuming, burdensome requirement on banks inconsistent with efficient commercial practice. The stamping of an item deposited with a collecting bank endorsement, however, is a simple task placing but a minimal burden on the flow of commercial transactions. Consequently, just as the existence of § 3–201(3) does not eliminate the need for a non-deposi-

tary bank transferee to obtain an endorsement to become a holder, neither does § 4–205(1) eliminate the need for a depository bank to provide an endorsement to obtain holder status. Although both § 3–201(3) and § 4–205(1) provide an absolute right to a transferee and to a depository bank, respectively, to have an endorsement, neither can be read as making the right to an endorsement the equivalent of the endorsement.

This construction finds support also in Section 3–202 which provides that: *"An indorsement must be written* by or on behalf of the holder and *on the instrument* or on a paper so firmly affixed thereto as to become a part thereof." (Emphasis added). Article 3's requirement that order paper bear an endorsement to achieve holder status is not inconsistent with Article 4's permitting the bank to add an endorsement. Rather, the provisions appear to be complementary and easily function in unison. To require a bank to make a mark on a paper to achieve certain rights is not inconsistent with enabling the bank to place the mark on the paper.

Moreover, the *Bowling Green* court's assertion that one who takes from a holder by transfer *is* a holder due to § 3–201(1) seems clearly at variance with the meaning of the Code. Under §3–201(1), a "[t]ransfer of an instrument vests in the transferee such rights as the transferor has therein. . . ." That section allows a transferee to assert the rights of his transferor against another party; to hold, however, as did the *Bowling Green* court, that § 3–201(1) enables the transferee of a holder to become a holder who is then able, other conditions being met, to be a holder in due course, would be to render the other sections previously discussed nugatory. There is nothing in the U.C.C. to indicate that § 3–201(1) is to apply differently to depository banks than to other transferees and thereby permit such an anomalous and inconsistent result. Rather, Article 3 applies to banks unless inconsistent with Article 4, which then governs to the extent of any inconsisten-

cy. § 4–102. This court finds no inconsistency between the Articles as they relate to the issues presented.

A final point should be made distinguishing the case of Suit & Wells Equip. Co. v. Citizens Nat. Bank of So. Md., 263 Md. 133, 282 A.2d 109 (1971). Although a cursory reading may indicate it stands for the principle that a bank becomes a holder when it gives value, the case did not so hold since it encompassed facts which made a decision on that point unnecessary. Plaintiff had contended that the bank, as an agent for collection under § 4–201, could not, because of its agency status, ever become a holder in due course. The court correctly held that a collecting bank which gives value can become a holder in due course and that value is given and a security interest attaches once funds are advanced. §§ 4–208 and 4–209. But in that case, the payee placed an unrestricted endorsement on the check before cashing it at the bank. The unrestricted endorsement made the instrument bearer paper, capable of negotiation by mere delivery. The bank took the check endorsed by the payee by negotiation, § 3–202, and became a holder under § 1–201(20) at that point. The court in *Wells* did not decide that the endorsement of the payee was not needed. It decided that the bank could become a holder in due course and was not barred from that status by § 4–201.

### III.

In sum, the court concludes that the law of Maryland governs the transaction and that United Overseas was not a holder in due course of the bill of exchange. The motions for summary judgment as presented must be denied.

These conclusions necessitate a determination of whether Veneers has a defense assertable against Madera. Defendant, in its motion for summary judgment, has not conclusively established by affidavit or record to the court's satisfaction the existence, nature, or extent of the claim it allegedly has against Madera. In fact, all indications

are that plaintiff's claim against defendant is larger than defendant's claim against Madera. Hence, further proceedings consistent with this opinion are required.

Therefore, for the reasons herein stated, it is ordered this 10th day of October, 1973, that:

1. Plaintiff's Motion for Summary Judgment be and hereby is denied;

2. Defendant's Motion for Summary Judgment be and hereby is denied; and

3. The Clerk is directed to mail a copy of this Memorandum and Order to counsel for both parties.

## ON MOTION FOR SUMMARY JUDGMENT

This case is again before the court for decision on a motion for summary judgment. Plaintiff, a Swiss bank, has brought suit on·a negotiable bill of exchange issued by defendant, the payor. The issue raised by the motion is whether defendant is entitled to offset against its liability on the bill an amount which represents money allegedly owed to defendant from Madera, S.A., the original payee of the bill, who transferred the instrument to plaintiff. Plaintiff's contention that it is a holder in due course was earlier rejected by this court; it now contends that set-off against a prior holder is not a defense which may be raised in a suit on a negotiable instrument brought by a transferee of the instrument and therefore that it is entitled to summary judgment in the full amount of the bill. That resolution of this issue is governed by Maryland law is settled by the court's order denying plaintiff's first motion for summary judgment. *See* Memorandum and Order of October 10, 1973.

The issue currently before the court is whether, under Maryland law, a party liable as payor of a negotiable instrument may offset[1] against a transferee of the bill a claim he has against the payee of the instrument.[2] The natural starting point for resolution of this issue is Annotated Code of Maryland, art. 95B, § 3–306 (1964), which sets forth the rights of one not a holder in due course. This section provides in part that: "Unless he has the rights of a holder in due course any person takes the instrument subject to . . . (b) All defenses of any party which would be available in an action on a simple contract . . . ." This rather open-ended language would seem on its face to be sufficiently broad so as to include the defense of set-off since that defense may be asserted in actions *ex contractu*. No Maryland case has construed it, however. Moreover, it is evident that subsection (b) was intended merely to restate the prior rule under section 58 of the Negotiable Instruments Law.[3] *See* Official Comment 3 to § 3–

[1]. There are in fact three means here relevant by which a defendant may seek to reduce his liability by asserting a claim against the plaintiff; these are set-off, recoupment and payment. The distinction between set-off and recoupment which is important for the purpose of this case is that the right of set-off is the right of defendant to set off against the plaintiff's demand a claim which is extrinsic to the transaction out of which plaintiff's claim arises, Ghinger v. Fanseen, 166 Md. 519, 172 A. 75, 78 (1934), whereas recoupment is involved when defendant seeks to reduce his liability by a demand which "grows out of and forms part of the contract in which the claim of the plaintiff originated . . . ." District Agency Co. v. Suburban Deliv. Serv., Inc., 224 Md. 364, 167 A.2d 874, 876 (1961). Payment, which is not truly a judicial procedure of setting off claims, would occur "where it is expressly or impliedly agreed between the promisor and the

payee that a cross-demand of the promisor shall be applied as a credit on the instrument . . . ." Stegal v. Union Bank & Federal Trust Co., 163 Va. 417, 176 S.E. 438, 447 (1934).

This Memorandum will deal first with the question of whether the defendant may avail itself of set-off. It then becomes necessary to discuss the availability of a recoupment claim in a suit on a negotiable instrument.

[2]. For the purpose of simplicity, the use of a claim against the payee of the bill by the payor in a suit by a transferee of the bill will be referred to hereinafter as "prior party set-off."

[3]. It also becomes evident when the section is considered against the background of the prior law that the term "defenses" is ambiguous and must be construed by reference to other authorities.

306. It is thus apparent that to determine the scope of the provision the court must look to the prior Maryland law.

Section 58[4] of the N.I.L., the section of that Act which sets forth the defenses which could be asserted against one not a holder in due course, provided in part: "In the hands of any holder other than a holder in due course a negotiable instrument is subject to the same defenses as if it were non-negotiable." No Maryland case to the court's knowledge has directly decided the question of whether prior party set-off is available in a suit on a negotiable instrument under section 58. There is, however, broad authority to the effect that prior party set-off is available in a suit by the transferee of a non-negotiable instrument. In Steele v. Sellman, 79 Md. 1, 28 A. 811 (1894), it was held that the assignee of a non-negotiable chose in action "took it subject to all the legal and equitable defenses of the debtor to which it was subject in the hands of the assignor at the time of the assignment. The defendant, therefore, could make the same legal and equitable defenses against [the assignee] as were available to him against [the assignor] at the time of the assignment . . . ." 28 A. at 811. The court held the broad right of set-off conferred by statute to be a defense which could be asserted even against the transferee of the chose in action. The argument which may then be made is that because of the plain language of the N.I.L., which makes defenses on non-negotiable instruments available against any transferee of a negotiable instrument who is not a holder in due course, prior party set-off is a defense on a negotiable instrument as a result of the *Steele* decision. This contention is possibly strengthened by the fact that the court referred to set-off as a "defense." Courts of some other states have in fact reached this result on the strength of such reasoning. Litcher

v. North City Trust Co., 111 Pa.Super. 1, 169 A. 409 (1933). *See also* Smith v. Fulton, 51 Ohio App. 12, 199 N.E. 218 (1935).

There is persuasive authority, however, to the effect that section 58 of the Negotiable Instruments Law does not, in and of itself, make a prior party set-off defense assertable against the transferee of a negotiable instrument simply by reason of the fact that such a defense is available on a non-negotiable instrument. What is probably the most comprehensively reasoned discussion is found in the case of Stegal v. Union Bank & Federal Trust Co., 163 Va. 417, 176 S.E. 438 (1934). There the court held that the true meaning of "defenses" in section 58 was technical defenses, that is, defenses on the note. Because set-off is not a defense of this sort, but is merely a right to assert a collateral claim against a plaintiff when one is sued, it is not included within section 58; thus section 58 itself should not operate to make a prior party set-off defense available in a suit upon a negotiable note. The court further held that section 58 would have no effect at all on the prior law of the state with regard to set-off; in other words, section 58 would not change prior statutes or decisions which stated that prior party set-off was available in a suit on a negotiable instrument by a transferee not a holder in due course. Ample support for these conclusions may be found in Note (a) to section 58 of the N.I.L., which states:

It is not deemed expedient to make provisions as to what equities the transferee will be subject to; for the matter may be affected by the statutes of the various states relating to set-off and counter-claim. On the question whether only such equities may be asserted as attach to the bill, or whether equities arising out of collateral matters may also be asserted,

---

4. The Negotiable Instruments Law was in force in Maryland from 1899 (Md.Laws [1898] ch. 119) until 1964, when it was replaced by the Uniform Commercial Code. *See*

Md.Laws [1963], ch. 538, § 1 (§ 10–102(1)). Section 58 appeared in the Code as section 77 of article 13.

the decisions are conflicting. In an act designed to be uniform in the various states, no more can be done than fix the rights of holders in due course. *See also* Turkenkoph v. TeBeest, 55 N. M. 279, 232 P.2d 684 (1951).

This court is, therefore, persuaded that to find whether prior party set-off may be asserted against the transferee of a negotiable instrument, it must examine the Maryland law apart from the statutes above discussed, that is, the Maryland law prior to 1898.

The starting point for such an examination is Annan v. Houck, 4 Gill. 325 (1846). This case involved a promissory note (which was apparently negotiable) which was endorsed after it was due (thus the endorsee could not qualify as a holder in due course). Stating that the language of the set-off statute was not sufficiently broad to encompass the situation at bar, the court held that the maker of the note could not set off a claim which he had against the payee in a suit brought by the endorsee of the note who took the note after it was past due. This holding was reinforced by Eversole v. Maull, 50 Md. 95 (1878), which held that only those defenses which arose from the transaction in which the note was given could be asserted against the transferee of the note.

These cases seem to hold that prior party set-off is not available in a suit on a negotiable instrument. When they are read in conjunction with Steele v. Sellman, *supra,* the Maryland law seems to be that there is a distinction between suits on negotiable instruments, where prior party set-off is not available, and suits on non-negotiable claims, where it is. Moreover, while the language used in these cases is possibly ambiguous,[5] the court is convinced that other available authority, in the form of statutes in effect at the date of these decisions,

shows that the basis of the holding was that the notes were negotiable.

There are two principal types of statutes which have been considered in the decisions involving set-off. The first is what is referred to as a simple statute of set-off and is a statute which grants any defendant the right, when sued, to set off against his liability any claims he has against plaintiff. The weight of authority is to the effect that such a statute is not a sufficient ground to enable the maker of a negotiable instrument to assert a prior party set-off. *See, e. g.,* Stegal v. Union Bank & Federal Trust Co., 176 S.E. at 448–449. The second type of statute is one which grants a debtor the right to set off claims he has against a creditor when sued by an assignee of the creditor's claim. Such statutes have been construed by some courts to afford a basis for the use of prior party set-off in a suit by the transferee of a negotiable instrument. Stegal v. Union Bank & Federal Trust Co., 176 S.E. at 450–451. *See, e. g.,* Futrall v. McKennon, 187 Ark. 374, 59 S.W.2d 1035 (1933).

Both of these types of statutes were in effect at the date of all three of the relevant decisions.[6] The statute originally enacted as Maryland Laws [1785], ch. 46, § 7 was a simple set-off statute. In addition, Maryland Laws [1830], ch. 165, § 3 provided that:

Any defendant may make the same legal or equitable defenses as might or could have been had and maintained against the assignor at the time of such assignment and before. notice, thereof and to the same extent.

This section is the same type as those which some courts have held to enable use of prior party set-off against the transferee of a negotiable instrument. It was part of the statute which permitted suit by assignees of non-negotiable

5. Language in the *Annan* case, *e. g.,* 4 Gill. at 331, might be construed as standing for the proposition that set-off is available only in a suit by the party against whom the set-off

claim lies. If this was the holding, it was overruled by Steele v. Sellman, *supra.*

6. Both statutes were repealed in 1957.

claims,[7] and was construed by the court in the *Steele* case to permit the assertion of a prior party set-off in a suit by the assignee of a non-negotiable claim; "defenses" was broad enough to include set-off. It has never been expressly construed by a Maryland case to extend prior party set-off to negotiable instruments.

The *Annan* decision must be read in light of the fact that the set-off statute was then in effect. By the terms of the statute the use of set-off was not restricted to a suit brought by a party against whom the set-off claim lay. For this reason, the court concludes that the holding of *Annan*, disallowing prior party set-off, turned on the fact that the instrument there involved was negotiable, despite any language in the opinion which could be read to the contrary. Therefore, and in the absence of any later decisions or statutory enactments warranting a contrary conclusion, this court believes the law of Maryland to be that prior party set-off, while available in a suit by the assignee of a non-negotiable claim, is not available in a suit by the transferee of a negotiable instrument.

The court is of the opinion that the distinction drawn between negotiable paper and non-negotiable choses in action in this respect is further supported by reference to the historical distinction between negotiable instruments and other claims. In the absence of a statute, the assignee of a chose in action took only equitable title to the claim and was unable to bring suit on the claim in his own name. *E. g.*, Hampson v. Owens ex rel. Stow, 55 Md. 583 (1881). He would thus be subject to all equities which accrue in favor of the debtor against the assignor. The statutes which enabled the assignee to bring suit in his own name preserved this historical distinction.[8] On the other hand, under the law merchant, as part of the policy in favor of free transferability of negotiable paper, transfer by negotiation of a negotiable instrument carried with it legal title to the instrument, and therefore the holder could sue on it in his own name. *E. g.*, 11 Am.Jur.2d Bills & Notes § 36 at 57; § 37 at 59. The holder has never stood in the shoes of a prior holder in the same manner as did the assignee of a chose in action; his right to sue is independent. Thus the negotiable instrument is not subject to the same policy which made the recovery of an assignee of a chose in action subject to set-off of collateral claims and the distinction between negotiable instruments and other claims is comprehensible. This distinction lends added weight to the court's conclusion that in the absence of some positive authority overturning the older rules they are still in effect in Maryland.[9] It therefore is of the opinion that under Maryland law prior party set-off is not available in this suit brought on a negotiable instrument.

This conclusion does not dispose of the matter before the court. Whatever the law may be with respect to set-off, the authorities appear to be virtually unanimous in holding that a recoupment claim is available in a suit on a negotiable instrument, regardless of whether the plaintiff is the original payee or a subsequent transferee. *See, e. g.*, Lukens v. Goit, 430 P.2d 607 (Wyo. 1967); Davis v. Miller Rubber Prod., 63 S.W.2d 901 (Tex.Civ.App.1933); Annot., 70 A.L.R. 245 (1931). *Cf.* Eversole v. Maull, 50 Md. 95 (1878). Thus if defendant can fit its adverse claim within the narrower scope of recoupment, it would appear that the claim

---

7. The statute was originally enacted as one section in 1829, Md.Laws [1829] ch. 51, and was the first Maryland statute which enabled an assignee of a chose in action to sue in his own name.

8. *See* note 6 *supra*. *See also* 4 Corbin, Contracts § 892 (1951).

9. There appears to be a sharp split of authority on this question elsewhere. *See* Morris, The Use of Set-Off, Counterclaim and Recoupment: Availability Against Commercial Paper, 62 W.Va.L.R. 141 (1962); Annot., 70 A.L.R. 245 (1931).

may be asserted irrespective of the resolution of the set-off issue.

The arguments and memoranda of the parties have been addressed solely to the question of whether set-off is available to defendant; no distinction has heretofore been made between set-off and recoupment. However, in opposition to plaintiff's second motion for summary judgment, defendant filed with the court two affidavits which raise the recoupment issue. The affiants are the president of Veneers, Inc. and the broker who on behalf of Madera arranged the transaction between Veneers and Madera. In summary, both affidavits state that the sale of the veneers to Madera by Veneers (the claim defendant seeks to offset against plaintiff in substance is for the purchase price of this material) and the sale of the logs to Veneers by Madera (plaintiff's claim in substance arose from this sale) were part of the same transaction, and that Veneers and Madera agreed that Madera was to pay Veneers before Veneers made payment to Madera. Unless the court were to rule as a matter of law that this claim is not assertable against the plaintiff under recoupment or some similar rubric, then it cannot be said that there is no issue as to a material fact. For the reasons which follow, the court will not attempt to determine whether such a ruling is proper at this time.

 The factual assertion contained in these affidavits raises an issue of law which is quite unrelated to the set-off issue to which the prior arguments have been addressed. The court is now faced with the question of whether this claim fits within recoupment or some similar defense; it has heard no arguments from the parties on this question. Moreover, the issue seems to be intertwined with the question of whether defendant's claim against Madera is valid, which is the chief, if not the only, factual question remaining for disposition. For these reasons, it seems more economical in terms of the court's and the parties' time and energy not to rule at this time on the legal question of wheth-

er these facts, if proven, establish that defendant's claim is one of recoupment. The legal issues relating to recoupment will therefore be left open for determination at trial along with the factual issues to be decided.

For the aforegoing reasons, it is this 9th day of May, 1974, ordered that plaintiff's second motion for summary judgment be and the same hereby is denied.