**GOLDEN PLAINS FEEDLOT, INC., Plaintiff,**

v.

**The GREAT WESTERN SUGAR COMPANY, A Subsidiary of Hunt International Resources Corporation, Defendants.**

**No. Civ. 82–5024.**

United States District Court, D. South Dakota, W.D.

June 6, 1984.

William G. Porter, Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, S.D., for plaintiff.

Donald R. Shultz, Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, S.D., for defendants.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

This case involves an alleged breach of contract for the sale of sugar beet pulp, a by-product of sugar beets used for livestock feed. Plaintiff, Golden Plains Feedlot, Inc. (Golden Plains-Buyer), alleges that on January 5, 1982, it entered into a contract with defendant, The Great Western Sugar Company (Great Western-Seller), for the purchase of 20,000.00 ton of beet pulp feed during the period January 5 to August, 1982. Golden Plains-Buyer contends that the sale was at an agreed price of $50.00 per ton, F.O.B. Great Western-Seller's Nebraska plant or plants. Finally, Golden Plains-Buyer alleges that after partial performance of the contract, Great Western-Seller refused to deliver further beet pulp feed and, therefore, breached the contract.

Great Western-Seller denies these allegations and asserts the statute of frauds as an affirmative defense. Additionally, Great Western-Seller counterclaims for goods sold and delivered from January 5 to January 15, 1982.

Great Western-Seller moves for summary judgment on all issues. Specifically, Great Western-Seller asserts there is no genuine issue of material fact concerning:

1. The existence of an oral contract for the sale of beet pulp feed; or, alternatively,

2. The failure of the oral contract to satisfy the statute of frauds, assuming the existence of an oral contract.

Moreover, with regard to its counterclaim, Great Western-Seller contends it is entitled to summary judgment because:

1. Partial performance takes any express oral contract out of the statute of frauds; or, alternatively,

2. The parties entered into an implied sales agreement for beet pulp feed sold and delivered on an open account, assuming no express oral contract was formed.

In resolving summary judgment motions, this Court is required to view the facts in

the light most favorable to the opposing party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153–59, 90 S.Ct. 1598, 1606–09, 26 L.Ed.2d 142 (1970). Also, this Court must give the opposing party the benefit of reasonable inferences to be drawn from underlying facts. *Id.* The Eighth Circuit Court of Appeals views summary judgment as an extreme remedy. *Windsor v. Bethesda General Hospital*, 523 F.2d 891, 893 n. 5 (8th Cir.1975). It is not to be granted unless the moving party establishes its right to judgment so as to leave no room for controversy. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir.1976). Moreover, the opposing party must not be able to prevail under any discernible circumstances. *Id.* at 209–10. With these principles in mind, this Court reviews the instant facts in the light most favorable to Golden Plains-Buyer.

## FACTS

Melvin Delzer is the principal of Golden Plains-Buyer, a cattle feedlot operation located in South Dakota. Goldman Depo., pp. 39, 41. Larry Moore is the feedlot manager. Moore Depo., p. 45. Golden Plains-Buyer feeds beet pulp pellets to its cattle. *Id.* at 63.

Melvin Delzer and Ted Venners are business associates in various enterprises, including coal, oil, and gas. Goldman Depo., p. 39–40. Venners has no relationship to Golden Plains-Buyer. *Id.* at 39.

Joyce Goldman has been employed by Venners as his personal secretary since April, 1981. *Id.* at 38–39. Prior to that time, Goldman was employed by Great Western-Seller from approximately 1970 to April, 1981. *Id.*

Nancy Stearns is employed as the senior customer service representative in Great Western-Seller's special products division, which is located in Colorado. Stearns Depo., p. 6. Paul Woods is Great Western-Seller's sales manager for the special products division. Woods Depo., p. 6.

In the morning of Tuesday, January 5, 1982, Goldman called Great Western-Seller to obtain a price quote for beet pulp pellets. Goldman Depo., pp. 42–43. Goldman had never before worked on behalf of Golden Plains-Buyer, but did so in this instance on the recommendation of Venners to Delzer. *Id.* at 41–42.

Goldman spoke with Nancy Stearns of Great Western-Seller. Goldman testified that Stearns quoted a beet pulp price of $50.00 per ton. *Id.* at 51. Goldman told Stearns that Golden Plains-Buyer "would like to contract for as much as 30,000 tons or whatever we could accept delivery on within their time frame." *Id.* at 52. Further, Goldman indicated the time frame discussed was from January 5 to the end of August, 1982. *Id.* at 63. Per Goldman's request, Stearns said she would give this information to Paul Woods, Great Western-Seller's sales manager. *Id.*

Woods called Goldman that same afternoon. *Id.* at 56. Goldman told Woods that Golden Plains-Buyer was "looking for up to 30,000 tons or whatever they had available." *Id.* Goldman further told Woods that if Golden Plains-Buyer could get this better price, it "wanted to immediately negotiate a contract." *Id.* at 57. Goldman indicated no problem in picking up beet pulp pellets from any of Great Western-Seller's Nebraska factories (Scottsbluff, Gering, Bayard, Mitchell). *Id.* Goldman asked Woods what Golden Plains-Buyer "needed to do to get everything moving." *Id.* Woods stated the need for credit approval. *Id.* Goldman gave Woods the names of Golden Plains-Buyer's feedlot manager, Larry Moore, and a South Dakota banker, Ray Klay. *Id.* Finally, Woods had to check inventories "to see exactly what was available, but that he didn't feel there was any problem with 30,000 tons." *Id.* at 58.

The next contact between the parties occurred on Thursday, January 7, 1982. Goldman called Great Western-Seller "to ask the status of the inventory check." *Id.* at 60. Goldman first spoke with Stearns who stated Great Western-Seller still did not have the inventory numbers. *Id.* at

61–62. Woods then came on the line and told Goldman that he expected to have the numbers by the end of the day. *Id.* at 62. Upon Goldman's inquiry, Woods stated he would ask about the status of the inventory check. *Id.* Woods said he would call Goldman as soon as he had the inventory numbers. *Id.*

On Friday, January 8, 1982, Goldman called Stearns and asked for Woods who was out for the day. *Id.* at 63. Goldman stressed that Golden Plains-Buyer "would like to get a contract so that we could have Mr. Delzer sign it. He is going to be traveling soon." *Id.* Stearns indicated she would try to reach Woods.

Later that same day, Stearns called Goldman to inform her that Woods would call on Monday, January 11, 1982, with the inventory numbers. *Id.* at 64. Goldman and Stearns conversed briefly about price. *Id.* Goldman referred to the $50.00 per ton price. *Id.* at 65–66.

On the same day these telephone conversations took place, Golden Plains-Buyer's trucks arrived at Great Western-Seller's Scottsbluff, Nebraska plant. Golden Plains-Buyer picked up 128.2 ton of beet pulp pellets. *Id.* Exhibit B. The invoice showed a $72.00 per ton sales price. *Id.*

On Monday, January 11, 1982, Goldman spoke with Woods. Woods told Goldman that Great Western-Seller could commit only to 7,000 ton at $72.00 through February and $78.00 from March through September. *Id.* at 71. Again, on this day, Golden Plains-Buyer's trucks picked up beet pulp pellets from Great Western-Seller's Scottsbluff, Nebraska plant, 60.31 ton invoiced at $72.00. *Id.* Exhibit B.

On Tuesday, January 12, 1982, Golden Plains-Buyer picked up 47.11 ton of beet pulp pellets invoiced at $72.00 per ton. *Id.* After this time, no further beet pulp was picked up.

Larry Moore testified concerning telephone conversations he had with Great Western-Seller representatives, but without the benefit of exact dates. Sometime during the first few days in January, 1982,

Moore testified that a girl named Nancy from Great Western-Seller called him. Moore Depo., pp. 52–53. Moore stated that this Nancy "asked me when we were going to start moving beet pulp, that we had bought the beet pulp, and asked me for a credit reference and I wouldn't give it to her." *Id.* at 54. No price was mentioned, but 20,000 ton was discussed. *Id.* Specifically, Moore further related this conversation as follows:

> She asked when the beet pulp could start moving. I told her I was in the process of lining the trucks up; in fact I had a man called and he was having trucks in Scottsbluff it was either the next day or the day after, but he was having trucks there within two days and I wanted to move it out within a month and get it all within as much as I could in a month and have it all brought into here within 90 days, the whole 20,000 ton and she said—she asked me for a credit reference, I told her I wasn't in a position to give her that because I didn't know her position, and that I would get credit clearance and give it to them. I am sure I told her I had to talk to Melvin [Delzer] about that.

*Id.* at 55. Moore testified that shortly thereafter, the same girl named Nancy called him again. *Id.* at 57–58. They discussed payment.

> I told—she asked me what our payment schedule was. I told her we paid our feed and trucking bills Tuesday of every week. Still no price was discussed. The product had been picked up by then, some of it had. I don't recall much else was discussed besides that. That seemed to be why she called me was to discuss payment.

*Id.*

At least four or five days after the second conversation with Nancy, Moore called Paul Woods. *Id.* at 52, 62, 63–64. Moore wanted to "find out if there would be any problem in the amount of pulp we were going to get, or how fast we got it, and he said there was no problem with that." *Id.* at 65. Moore recalled Woods "saying something about a credit check thing and I

had told him I had given it to a girl called Nancy, and he said something to the effect of, 'that's fine. That's always necessary,' or something like that." *Id.* at 66. Price was mentioned, but Moore could not remember exactly what was said. *Id.*

## CHOICE OF LAW

Golden Plains-Buyer bases its claim on an oral telephonic contract between the parties' representatives in South Dakota and Colorado. Golden Plains-Buyer's complaint alleges a Nebraska delivery site. Initially, therefore, this Court must determine which state's substantive law applies to determine the rights and obligations of the parties. Great Western-Seller contends Nebraska law applies; Golden Plains-Buyer contends either South Dakota or Colorado law applies.

The parties do not dispute that the Uniform Commercial Code (UCC) applies to this transaction. *See, e.g., Arcon Construction Co., Inc. v. South Dakota Cement Plant,* 349 N.W.2d 407 at 410 (SD 1984). South Dakota has adopted the UCC. Thus, under the *Erie-Klaxon* doctrine, this Court must apply South Dakota's choice of law rules to determine the applicable law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see Medtronic, Inc. v. Gibbons,* 684 F.2d 565 (8th Cir.1982).

South Dakota's UCC has its own general choice of law provision applicable to the instant transaction. SDCL 57A–1–105(1) provides:

1. Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this title applies to transactions bearing an appropriate relation to this state.

The record discloses no agreement between the parties as to what law governs.

Consequently, South Dakota law applies to this transaction if it bears an "appropriate relation" to South Dakota. The question becomes what is the meaning of "appropriate relation" in South Dakota.

This Court has not discovered, nor have the parties cited, a South Dakota case defining "appropriate relation." The Court must therefore determine what the South Dakota Supreme Court would declare the law to be.

The authority in this area is by no means clear. Many courts simply outline the transaction, list the contacts, and conclude there was an appropriate relation to their state. *E.g., Skinner v. Tober Foreign Motors, Inc.,* 345 Mass. 429, 187 N.E.2d 669 (1963) (contract entered into and delivery made in Massachusetts; therefore, Massachusetts law applied); *Whitaker v. Harvell-Kilgore Corp.,* 418 F.2d 1010 (5th Cir. 1969) (court failed to discuss which contacts sufficient to create an appropriate relation to Georgia); *Park County Implement Co. v. Craig,* 397 P.2d 800 (Wyo. 1964) (Wyoming residents obtained automobile in Montana, drove to Wyoming where auto destroyed by fire; Wyoming had appropriate relation); *Lloyd v. Classic Motor Coaches, Inc.,* 388 F.Supp. 785 (N.D.Ohio 1974) (contract formed in Florida, to be performed in Ohio; Ohio law applied).

Some courts define "appropriate relation" as "any relation." A strict reading of the statute allows such an interpretation. *See Teel v. American Steel Foundries,* 529 F.Supp. 337 (E.D.Mo.1981); *Atlanta Corp. v. Ohio Valley Provision Co.,* 414 A.2d 123 (Pa.1980). In *Teel* the plaintiff commenced action in a Missouri Federal Court based on a tractor-trailer crash which occurred in Kentucky. Plaintiff alleged breach of warranty as a result of a defective fifth wheel. The *Teel* court held that Missouri had an "appropriate relation" because plaintiffs were Missouri residents and the tractor was primarily situated in Missouri. 529 F.Supp. at 344. The court, therefore, applied Missouri law. *Id.*

Most commentators reject this forum-oriented, "any relation" approach. *See* Nordstrom and Ramerman, *The Uniform Commercial Code and the Choice of Law,* 1969 Duke Lw. Journal 623; Siegel, *The U.C.C. and Choice of Law: Forum Choice or Forum law,* 21 Am.Univ.L.Rev. 494 (1972); Note, *Conflicts of Laws and the "Appropriate Relation" Test of Section 1–105 of the Uniform Commercial Code,* 40 George Wash.L.Rev. 797 (1972). The history of section 1–105(1) does not support such an approach. *Id.* Moreover, minimal contact with the forum state results in increased forum shopping. *United Overseas Bank v. Veneers, Inc.,* 375 F.Supp. 596, 601 (D.Md.1974). There are very few instances where the forum does not have *some* relation to a sales transaction. Consequently, this Court rejects such a strict approach as destroying the predictability and uniformity sought by the UCC.

The vast majority of courts seek to define "appropriate relation" in terms of the recent trend in choice of law problems, *i.e.,* the "most significant relationship" test. *See* Restatement (Second), Conflict of Laws, § 188(1), 191 (1971). Different jurisdictions define this test under the titles of "interest analysis" or "center of gravity" or "most significant contacts." But, however characterized, these courts define "appropriate relation" in a manner commensurate with the particular jurisdiction's approach to conflicts problems.

The plaintiff in *Bunge Corp. v. Biglane,* 418 F.Supp. 1159 (S.D.Miss.1976), alleged breach of an oral telephonic contract for future delivery of soybeans. The question was whether Mississippi or Louisiana law applied. First, the court recognized the applicability of the Mississippi Uniform Commercial Code (MUCC) § 105(1). Second, the court noted that prior to the MUCC, Mississippi applied traditional choice of law principles to contract actions, *i.e.,* law of place of performance or making. Next, the court cited the Mississippi Supreme Court's recent adoption of the "center of gravity" approach to conflicts problems. Finally, the court applied the "center of gravity" test to conclude Louisiana substantive law controlled the case. *Bunge Corp.,* 418 F.Supp. at 1163–4.

Effectively, the *Bunge* court defined "appropriate relation" in MUCC § 1–105(1) by resorting to Mississippi's general contract choice of law rule. Most courts appear to define "appropriate relation" in a similar manner. *See Ideal Structures Corp. v. Levine Huntsville Development Corp.,* 251 F.Supp. 3 (N.D.Ala.1966); *United Overseas Bank,* 375 F.Supp. at 601; *General Electric Credit Corp. v. R.A. Heintz Const. Co.,* 302 F.Supp. 958 (D.Ore.1969); *Neville Chem. Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3rd Cir.1970); *Aldon Industries, Inc. v. Don Myers & Assoc., Inc.,* 517 F.2d 188 (5th Cir.1975); *Gates Robber Co. v. USM Corp.,* 351 F.Supp. 329 (S.D.Ill.1972); Annot., 63 A.L.R.3rd 341 (1975).

South Dakota's general choice of law rule is legislatively mandated. SDCL 53–1–4 provides:

A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.

South Dakota, therefore, appears to be one of the few jurisdictions that adheres to the traditional *lex loci contractus* rule. *See* Restatement (First), Conflict of Laws, §§ 332, 334 (1934).

Clearly, the modern trend in the choice of law area is the Restatement (Second) approach, implementing the "most significant relationship" test. This approach finds support in the official comments to § 1–105 where the Code draftsmen refer to "significant contacts" in discussing "appropriate relation." UCC § 1–105, Official Comment 3. Arguably, this Court should use this approach to define "appropriate relation" in SDCL 57A–1–105(1).

The South Dakota Supreme Court has indicated otherwise, however. In *Anderson v. Taurus Financial Corp.,* the Supreme Court held that the validity of a sale and leaseback agreement of office equip-

ment and furniture entered into between a South Dakota physician and a California corporation would be measured by California law. 268 N.W.2d 486, 488 (S.D.1978). *Anderson*, of course, did not involve a UCC transaction. However, the court did reject, in the absence of legislative action, the application of the theory of significant contacts to determine the applicable law. *Id.*

The *Anderson* court began its discussion with SDCL 53–1–4, holding that California constituted the place of performance. *Id.* Further, the court concluded that California law applied under the place of making test, even assuming that the place of performance could not be determined. *Id.* The South Dakota Supreme Court was very clear.

> Under South Dakota law, the test of where a contract is made is the situs of the last act necessary, to give the contract validity. *Briggs v. United Services Life Insurance Co.*, 80 S.D. 26, 117 N.W.2d 804 (1962). California is the place where the last act to make the agreement between Taurus and Anderson a valid and binding contract occurred. That act was the signing of the contract by Taurus' representative. While the Eighth Circuit Court of Appeals has been critical of South Dakota's adherence to the last act rule for determining where a contract was made, *see American Service Mutual Insurance Co. [v. Bottum ]*, 8 Cir., 371 F.2d 6, 9 n. 2 (1967), *this court declines to change that rule in the absence of legislative action. The trial court erred in using the theory of significant contracts to determine what law should apply to this transaction.*

*Id.* (emphasis added).

Consequently, South Dakota adheres to traditional contract choice of law principles in the face of the recent trend. Therefore, this Court believes South Dakota would construe SDCL 53–1–4 *in pari materia* with SDCL 57A–1–105(1) to define "appropriate relation."

There can be no question that the alleged oral contract was to be performed in Nebraska. The only delivery sites discussed between the parties were the Nebraska plants. Golden Plains-Buyer's own complaint alleges the contract term "F.O.B., Great Western's Nebraska plant or plants." Golden Plains-Buyer picked up beet pulp pellets at the Scottsbluff, Nebraska plant. Accordingly, Nebraska is the place where the alleged contract was to be performed. Consequently, Nebraska bears an "appropriate relation" to the instant transaction within the meaning of SDCL 57A–1–105(1). Nebraska substantive law applies to determine the rights and liabilities of the parties.

## DISCUSSION

### A.

Great Western-Seller argues that it is entitled to summary judgment because no oral contract was formed. The Eighth Circuit Court of Appeals' decision in *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207 (8th Cir.1976), will not allow this Court to grant summary judgment on this issue. In *Johnson* the plaintiff alleged that following negotiations, the parties entered into an oral contract for the sale of a chemical fertilizer, at $370.00 per ton. The defendant denied that it entered into an oral contract and moved for summary judgment. The district court granted the defendant's motion and dismissed the complaint. The Eighth Circuit Court of Appeals reversed and remanded. *Johnson Grain*, 541 F.2d at 211.

The *Johnson Grain* court noted that the deposition testimony conflicted. The court recognized the weakness of the plaintiff's case, even resolving the conflict in the plaintiff's favor. Further, the Eighth Circuit stated in dicta:

> Had the case been submitted to the district court for decision on the merits rather than on the defendant's motion, and with the burden of proof resting on the plaintiff, we think that the district court might permissibly have found ... that there was never any contract between the parties.... On the basis of

such [a] finding [ ], the propriety of dismissing the plaintiff's complaint would have been rather clear.

*Id.* at 210. Nonetheless, the Eighth Circuit Court of Appeals concluded that summary judgment was improvidently granted because

in order to grant a summary judgment in favor of the defendant the district court was required to resolve the conflicts in the testimony in favor of the plaintiff and to give to the plaintiff the benefit of all inferences reasonably to be drawn from the testimony. That is to say, the district court was required to view the evidence as establishing that there was an oral contract between the parties that would have been enforceable apart from the statute of frauds....

*Id.*

As in *Johnson Grain*, Golden Plains-Buyer's case is a weak one. Joyce Goldman's deposition testimony is replete with evidence of contract negotiations. Having worked for Great Western-Seller, Goldman was aware of the necessity of credit approval for new customers. Goldman knew an inventory check was being made.

Notwithstanding Goldman's testimony, there are conflicts and ambiguities in the evidence, specifically with respect to the deposition testimony of Larry Moore, Nancy Stearns and Paul Woods. Moore testified that Stearns "asked me when we were going to start moving beet pulp, that we had bought the beet pulp." Moore Depo., p. 54. According to Moore, he discussed with Stearns organizing and moving "the whole 20,000 tons" by truck within 90 days. *Id.* at 55. After Golden Plains-Buyer picked up some beet pulp, Moore conversed with Stearns about the payment of bills. *Id.* A few days after these conversations with Stearns, Moore spoke with Woods who said there was no problem with "the amount of pulp [Golden Plains-Buyer was] going to get, or how fast [they] got it." *Id.* at 65. Of course, Stearns' and Woods' deposition testimony differs dramatically from Moore's account of the events. Accordingly, based upon *Johnson Grain,*

Great Western-Seller's motion for summary judgment on this issue will be denied.

## B.

Great Western-Seller next argues that if an oral contract was formed, it is unenforceable and fails because of lack of agreement as to essential terms. *Johnson Grain* and the above discussion speak to this issue. Similarly, therefore, Great Western-Seller's motion for summary judgment on this issue will be denied.

## C.

Great Western-Seller argues in the alternative that if an oral contract was formed, the statute of frauds renders it unenforceable. If the contract is unenforceable, Great Western-Seller concludes it is entitled to summary judgment on its counterclaim under the doctrine of partial performance.

Golden Plains-Buyer counters that the exception embodied in § 2–201(3)(b) precludes summary judgment. Additionally, Golden Plains-Buyer relies heavily on the doctrine of equitable estoppel to prevent Great Western-Seller from asserting the statute of frauds as a defense.

This Court held that Nebraska law applies to this transaction. The statute of frauds, section 2–201 of the Nebraska Uniform Commercial Code, provides in pertinent part:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense *unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.* A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable.

  (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

  (c) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 2–606).

(Emphasis added).

The parties do not dispute that the alleged sale of beet pulp feed was for more than $500.00. Likewise, the parties do not dispute that there was no writing sufficient to indicate that a contract for sale was made and signed. Indeed, Golden Plains-Buyer neither argues in its brief nor presents facts before the Court regarding the existence of a sufficient writing. *See* Fed.R.Civ.P. 56(e).

Golden Plains-Buyer urges the § 2–201(3)(b) exception. Specifically, Golden Plains-Buyer contends that Great Western-Seller's counterclaim constitutes a clear admission that an oral contract existed. Because of the dispositional posture of the issues in this case, the Court need not reach this contention.

■ Golden Plains-Buyer relies heavily on the doctrine of equitable estoppel to prevent Great Western-Seller from asserting the statute of frauds as a defense. South Dakota law, upon which Golden Plains-Buyer relies, recognizes this doctrine under the instant circumstances. *Farmers Elevator Co. of Elk Point v. Lyle*, 90 S.D. 86, 238 N.W.2d 290, 293 (S.D. 1976). Nebraska law does not. *Farmland Service Coop, Inc. v. Klein*, 196 Neb. 538, 244 N.W.2d 86, 90 (1976); *Schott Grain Co. v. Rasmussen*, 197 Neb. 267, 267–68, 248 N.W.2d 42, 42 (1976); *Wilke v. Holdrege Cooperative Equity Exchange*, 200

Neb. 803, 806–7, 265 N.W.2d 672, 674–5 (1978). Equitable estoppel, therefore, is not available to Golden Plains-Buyer in the case at bar. The statute of frauds is a valid defense for Great Western-Seller.

■ It is undisputed that Golden Plains-Buyer picked up approximately 230 [1] ton of beet pulp feed from Great Western-Seller's Scottsbluff, Nebraska plant on January 8, 11, and 12. It is also undisputed that Golden Plains-Buyer has not paid for this feed. Assuming the existence of an oral contract, it was unenforceable under § 2–201, except to the extent of approximately 230 ton of beet pulp feed received and accepted by Golden Plains-Buyer. *Jessen v. Ashland Recreation Assn.*, 204 Neb. 19, 23, 281 N.W.2d 210, 213 (1979). Great Western-Seller argues the invoice price at $72.00 per ton. Golden Plains-Buyer would argue the price term is $50.00 per the terms of the oral contract. It is clear therefore, that ultimately there may be need for the resolution of an issue of fact concerning the price term and, possibly, the exact quantity term.

On the other hand, if the factual issues are resolved against the formation of an oral contract, Golden Plains-Buyer is still liable under an implied agreement to pay for beet pulp feed sold and delivered on an open account. Accordingly, this Court will grant Great Western-Seller's Motion for Summary Judgment on its counterclaim, but only to the extent of liability. The price of the approximately 230 ton of beet pulp feed will depend on the ultimate resolution of all factual issues at trial.

---

**1.** By this Court's calculations, the invoices show a total of 235.62 ton. Goldman Depo., Exhibit B. However, Great Western-Seller's brief refers to 227.62 ton, while Golden Plains-Buyer's brief refers to 235.12 ton.