The **BANK OF WYANDOTTE,**
Plaintiff,

v.

**Kermit D. WOODROW et al.,**
Defendants.

No. 73 CV 114-SW.

United States District Court,
W. D. Missouri,
Southwestern Division.

May 8, 1975.

Ross T. Roberts, Joplin, Mo., for plaintiff.

Karl W. Blanchard, Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, Mo., for defendants.

George C. Baldridge, Joplin, Mo., for third party defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

On October 30, 1974 the parties filed Standard Pretrial Order No. 2 in the present case. In addition to setting forth a stipulation of undisputed facts, that order provided that this case should be submitted for decision by the Court on the basis of evidence in the record without further evidentiary proceedings. This Court has accordingly reviewed the record, together with the excellent briefs of the parties, and makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

The following facts have been stipulated by the parties:

1. Plaintiff is a state bank, chartered by the State of Oklahoma, and engaged in the general banking business at Wyandotte, Oklahoma.

2. W. Dabney Smith is, and at all times material hereto was, president and managing officer of plaintiff; and is a member of and chairman of the Board of Directors of plaintiff.

3. Mrs. Virginia Smith, the wife of Dabney Smith, is and at all times material hereto was, secretary, vice-president and cashier of plaintiff, and a member of its Board of Directors.

4. Mr. and Mrs. Smith together own a controlling interest in plaintiff bank.

5. Defendants Kermit D. Woodrow and Lark Cooper are copartners d/b/a Burney Wiles Commission Company, with officers at the Joplin Stockyards, Joplin, Missouri. Their principal business is the sale of cattle and hogs at the Joplin Stockyards, for which they are paid a commission by the owners of the livestock sold. They also buy and sell livestock on their own account.

6. Third party defendant Paul Durbin was, at all times material to this action, engaged in the business of buying and selling cattle, principally in Missouri, Oklahoma and Arkansas; and he regularly used the services of defendants in the sale of cattle at the Joplin Stockyards.

7. Third party defendant Donna Durbin is the wife of Paul Durbin, and at all times material hereto kept Paul Durbin's books and records and handled the bank accounts.

At all times material hereto, and for some years prior, Paul and Donna Durbin maintained a joint bank account in plaintiff Bank.

9. On August 6, 1973 (all references to dates hereinafter are to the year 1973, unless otherwise stated), the Durbins deposited to their account in plaintiff bank a check drawn by one Howard Corn on the Farmers State Bank of Afton, Oklahoma (hereinafter referred to as the "Bank of Afton"), in the amount of $18,497.42. On August 7, the Durbins deposited to their account a second check drawn by Howard Corn on the Bank of Afton in the amount of $4,231.68. On August 8 the Durbins deposited to their account a third check drawn by Howard Corn on the Bank of Afton in the amount of $12,046.15. The Durbins were given immediate credit as to these checks, and were permitted to and did draw against their account, including these deposits. Plaintiff bank forwarded each such check for collection through regular banking channels.

10. On August 6, Paul Durbin drew and delivered to defendants a check drawn on plaintiff bank in the amount of $17,162.05 in payment for cattle sold to Paul Durbin by defendants on that day. This check was deposited by defendants to their account in the Cornerstone Bank, Southwest City, Missouri, and sent by that bank through regular banking channels for collection.

11. On Friday morning, August 10, Mrs. Durbin deposited a check in the amount of $2,150.75 to the Durbin's account in plaintiff bank. Including the credit given for that check (and all previous deposits, including the three Howard Corn checks mentioned in paragraph 9), the Durbin account would have shown, at that time, a balance in the amount of $6,202.05.

12. Later in the morning on Friday, August 10, following Mrs. Durbin's aforesaid deposit of $2,150.75, an officer of the Bank of Afton telephoned Dabney Smith of plaintiff bank, and informed him that the three Howard Corn checks, totaling $34,875.25, mentioned in paragraph 9, had been dishonored as having been drawn on uncollected funds, and were being returned to plaintiff bank unpaid. Mr. Smith was told that the officers of the Bank of Afton were "going to get to the bottom of this." These three checks were placed in the mail on the same date by the Bank of Afton, directed to plaintiff bank via the Oklahoma City branch of the Kansas City Federal Reserve Bank (all references to the "Federal Reserve Bank" are to said Oklahoma City branch).

13. On that same Friday, August 10, checks totaling $19,188.03 drawn on the Durbin account were presented to plaintiff bank for payment, being received in the morning's cash letter from the Federal Reserve Bank. Following the conversation with the Bank of Afton, referred to in paragraph 12 above, said checks were prepared by plaintiff bank for return as having been drawn on uncollected funds, when Mrs. Durbin returned to plaintiff bank and deposited a

$13,000 check. At that time Mr. Smith informed Mrs. Durbin of the return of the Corn checks and stated that he was not going to pay any Durbin checks until this was taken care of. Mr. Smith says Mrs. Durbin stated that she would have sufficient funds to cover the Corn checks in the next day or two, and requested that Mr. Smith pay such checks on the account as had been presented for payment that day. Mr. Smith agreed at that time to pay such checks (and the same were paid).

14. On Saturday, August 11, the check in the amount of $17,162.05, drawn by Paul Durbin in favor of defendants, mentioned in paragraph 10, arrived at plaintiff bank in the cash letter from the Federal Reserve Bank.

15. During the period from August 10 through August 12 Paul Durbin had delivered to the Joplin Stockyards something in excess of 100 head of cattle, which were consigned to defendants for sale to Durbin's account. Such sale was to take place on August 13.

16. On the morning of Monday, August 13, at the request of Mrs. Durbin, defendants issued to the Durbins the $35,000 check at issue in this case, as an advance payment for the aforesaid cattle which were to be sold later that day.

17. On Monday, August 13, Mrs. Durbin came to plaintiff bank sometime during the morning and presented the following checks for deposit:

| | |
|---|---|
| $35,000.00 | Drawn on defendants and the check at issue |
| 10,792.35 | Drawn on V. E. Durbin (Paul Durbin's brother) |
| 10,000.34 | Drawn on National Livestock Commission |
| 10.00 | Drawn on Lark Cooper |
| $55,802.69 | |

Mr. Smith again informed Mrs. Durbin he was not going to pay any more checks drawn on the Durbin account until the checks deposited that day (August 13) had been paid and the proceeds credited to the account of plaintiff bank.

Mrs. Durbin requested that the bank pay certain small checks totaling $501.-68, which were outstanding. The bank agreed to do so and these checks were paid during the period August 14–17. The four checks set out above were credited to the Durbin account in plaintiff bank but, in accordance with Mr. Smith's statement to Mrs. Durbin, without any right of withdrawal.

18. The cattle which were to be sold by the defendants for the Durbins on August 13 were in fact sold on that day, netting the sum of $46,008.93. At the close of that sale in the late afternoon or early evening of August 13, defendants give to Paul Durbin their additional check for $11,008.93, representing the difference between the $35,000.00 advance given to Mrs. Durbin early that morning, and the total net proceeds from the sale of the cattle.

19. On August 13 ten checks drawn on the Durbin account, totaling $112,219.57, which had been received by plaintiff bank on either Saturday, August 11, or Monday, August 13, were returned unpaid by plaintiff bank by reason of being drawn on uncollected funds. Included among those checks was the check drawn by the Durbins in favor of the defendants in the sum of $17,162.05.

20. Plaintiff bank did not give wire or telephone notice of the dishonor of the aforesaid $17,162.05 check.

21. On August 14, Mrs. Durbin informed Mr. Smith that her husband Paul was missing, and that she was going to ask Mr. V. E. Durbin to stop payment on the $10,792.35 check deposited by her on August 13 (paragraph 17 above) because she "did not want him (V. E. Durbin) to get hurt" (and payment on that check was subsequently stopped).

22. The three Corn checks, totaling $34,875.25 mentioned in paragraphs 9 and 12 above, were received by plaintiff bank from the Federal Reserve Bank on August 14, each of the same being marked on the face thereof with the notation "drawn on uncollected funds."

Said checks were placed in a "special items account" and an attempt to collect them was made. However, payment was never received, and the checks were charged back against the Durbin account on the following days: on August 21, the $4,231.68 check and the $12,146.15 check and on September 14, the $18,497.42 check. None of said checks were charged back against the Durbin account at any time prior to the dates indicated immediately above.

23. On August 16 defendants were notified by their bank, (which had been notified by the Federal Reserve Bank in St. Louis) that the $17,462.05 check drawn by the Durbins had been returned unpaid. Immediately thereafter, on the same date, the defendants issued a stop payment order with respect to the $35,000 check at issue in this case. Plaintiff bank was notified of the stop payment order by defendants' bank on the same day.

24. The National Livestock Commission Company check, in the amount of $10,000.34 and the Lark and Cooper check for $10.00 both deposited on August 13 by Mrs. Durbin (see paragraph 17 above) and the checks for $2,150.75 and $13,000 deposited by Mrs. Durbin on August 10 (see paragraphs 11 and 13 above) were collected and the funds credited to plaintiff bank.

25. On August 24 plaintiff bank charged back against the Durbin account the $35,000 check at issue in this case and the $10,792.35 check drawn by V. E. Durbin (see paragraph 17 above).

26. During the period from August 10, 1973 to October 19, 1973 when the account was closed, no checks were paid on said account other than the checks totaling $19,188.03 mentioned in paragraph 13 above, and the checks totaling $501.68 mentioned in paragraph 17 above. Additional deposits to the Durbin account were made by Mrs. Durbin on August 17, 1973 in the amount of $200.00 and on August 22, 1973, in the amount of $3,846.91. No other deposits were made to the account other than as

hereinbefore set forth and when the account was closed on October 19, 1973 it reflected an overdraft balance of $21,503.32.

27. Plaintiff bank had either actual or constructive notice of the fact that it was returning unpaid the $17,162.05 check given by the Durbins to defendants on the same day it had received the $35,000 check at issue in this case drawn by defendants.

28. On August 17 plaintiff bank returned unpaid, as being drawn on uncollected funds, a check in the amount of $24,000 drawn by Paul Durbin to the order of defendants. Said check was returned by mail, bearing the notation that it was returned unpaid as "drawn on uncollected funds," through ordinary banking channels, before the end of the next banking day following the date of its receipt at the bank. No wire or telephone notice of non-payment of this check was given at any time.

29. On August 20 plaintiff bank returned unpaid, as having been "drawn on uncollected funds," a check in the amount of $7,610.03, drawn by Paul Durbin to the order of defendants. Said check was returned by mail, bearing the notation that it was returned unpaid as "drawn on uncollected funds," through ordinary banking channels, before the end of the next banking day following the date of its receipt at the bank. No wire or telephone notice of non-payment of this check was given at any time.

30. The checks in the amounts of $17,462.05, $24,000.00 and $7,610.03, referred to above, were given by defendants for value, were dishonored, and defendants have never been paid for the same.

31. Plaintiff bank has never been paid with respect to the $35,000.00 check at issue in this case.

32. At all times in question plaintiff bank operated under and was subject to the regulations and operating letters of the Federal Reserve Bank in the handling of checks.

*Complaint*

The present action was commenced by plaintiff's complaint seeking to recover $35,000.00 allegedly due from defendants on the check of August 13, 1973 issued by defendants to the Durbins. For the reasons stated below, we conclude that judgment on the complaint must be entered in favor of the plaintiff.

■ Defendant, as drawer of the $35,000.00 check is legally obligated that upon dishonor, he will pay the amount of the check to the holder. V.A.M.S. § 400.3–413(2). Under the stipulated facts of this case, it is clear that the plaintiff is a "holder" of the check within the meaning of V.A.M.S. § 400.1–201(20).[1] The right of a holder to enforce payment of the check, however, is subject to all defenses which the drawer could assert against the original payee in an action on a simple contract. V.A.M.S. § 400.3–306(b).[2] The question in this case is whether the defendant has any such defenses.

The stipulated facts of this case do not disclose, nor do defendants assert, any defense to plaintiff's claim arising out of the transaction in which the $35,000 check was issued. Indeed, it is apparent from Findings 16 and 18, *supra*, that defendants received full value for that check. The only "defenses" which defendants do assert is the claim that they are entitled to "set-off" the three checks totaling $48,772.08 which they received from the Durbins in separate transactions and which were subsequently dishonored.

■ There is no indication from the language of § 400.3–306(b) whether the term "defenses" includes set-offs arising from separate and independent transactions. But the meaning of that term can be ascertained by references to parallel sections of the Code. The principle stated in § 400.3–306(b) that a person not a holder in due course is subject to the defenses of the drawer, as stated in § 400.3–306(b), corresponds with § 400.-3–302(1)(c), which states that a holder in due course is a holder who takes the instrument "without notice . . . of any defense." Section 400.3–304(4)(f) then goes on to state that:

(4) Knowledge of the following facts does not of itself give the purchaser[3] notice of a defense or claim

\*　\*　\*　\*　\*　\*

(f) that there has been default in payment . . . of any other instrument, except one of the same series.

These references make it apparent that the term "defenses," as used in the Code, were not intended to cover set-offs, such as the defendant seeks to assert in this case. This conclusion is further buttressed by § 400.3–304(1)(b) which states that a purchaser has notice of a defense when he has notice that the instrument is "voidable." Comment 3 to that section states that:

"Voidable" obligation in paragraph (b) of subsection (1) is intended to limit the provision to notice of defense which will permit any party to avoid his original obligation on the instrument, as distinguished from a set-off or counterclaim.

This conclusion is also consistent with prior Missouri case law. Section 3–306(b) of the Uniform Commercial

---

1. Defendant argues that V.A.M.S. §§ 400.4–208 and 209 impose the requirements that, for a person to be a holder, he must have given value for the check. This argument is not well taken since those provisions by their own terms apply only to the determination of the question of a "holder *in due course.*"

2. The provisions of Article 3 of the U.C.C. are applicable to cases involving checks, except where such provisions are in direct conflict with Article 4. V.A.M.S. § 400.4–102(1).

3. The stipulated facts of this case demonstrate that the $35,000 check was negotiated to plaintiff, thereby making him a "purchaser" of that instrument. V.A.M.S. § 400.1–201(32), § 400.3–202(1).

Code, codified in Missouri as § 400.3–306(b), is merely a restatement of Section 58 of the Uniform Negotiable Instruments Law. See Comment 3 to Section 3–306; United Overseas Bank v. Veneers, Inc., 375 F.Supp. 596 (D.Md. 1974). Missouri decisions under Section 58 of the NIL [4] uniformly hold that a holder of an instrument:

> although not a holder in due course, is subject only to such infirmities and defenses as are connected with the (instrument) itself and not such as grow out of separate and distinct transactions between the original parties. Glaus v. Gosche, 118 S.W.2d 42, 45 (Mo.App.1938).

See also City of Gallatin v. Feurt, 330 Mo. 894, 50 S.W.2d 1027 (1932); and Powers v. Woolfolk, 132 Mo.App. 354, 111 S.W. 1187 (1908).

For all of the above reasons, we conclude as a matter of law that defendant may not assert its claims for $48,772.08 arising from other checks issued in separate transactions as a set-off to plaintiff's action to collect the $35,000 check. In the absence of such set-offs, defendant has no defense to plaintiff's claim.[5] Judgment must therefore be granted for plaintiff on its original complaint.

*Counterclaim*

Defendant's counterclaim seeks $48,772.08, the amount of the three checks drawn on the Durbin's account and dishonored by the plaintiff. The basis [6] of this claim is plaintiff's alleged failure to give wire or telephone notice of nonpayment as required by the Federal Reserve Bank Operating Letter No. 3B, ¶ 18(c), (September 21, 1972), which states that:

> All paying banks and collecting banks must receive, handle, and forward cash items in accordance with the following uniform instructions regarding protest and wire advice of nonpayment . . .
>
> \* \* \* \* \* \*
>
> (c) WIRE ADVICE of nonpayment of any item of $1,000 or over . . . .

■ It is clear that the provisions of this letter are enforceable against the plaintiff. Under V.A.M.S. § 400.4–302, a payor bank is accountable for the amount of any demand item if the bank does not send notice of dishonor until midnight of the next banking day following receipt of the item. Section 400.3–508 provides that notice of dishonor "may be given in any reasonable manner." However, Section 400.4–103(1) allows the parties to vary these provisions by agreement. And, since Section 400.4–103(2) states that Federal Reserve letters "have the effect of agreements under subsection (1)," the requirements set forth in the Federal Reserve letter in this case are controlling and enforceable.

Plaintiff does not seriously contend that it is not bound in this manner. Nor does it contend that it has complied with the requirements of the letter. See Findings of Fact 20, 28 and 29, *supra.* Instead, it argues that defendant has shown no damage attributable to this failure to comply.

The measure of damages in situations such as this is "the amount of the item

---

4. The NIL was in force in Missouri from 1905 to 1965. See V.A.M.S. § 401.001 et seq.

5. Much of defendant's brief is devoted to the question of whether plaintiff is a holder in due course. Our conclusion that plaintiff is entitled to recover as a mere holder renders it unnecessary to reach that question.

6. Defendant's counterclaim also alleges as a ground for recovery that plaintiff improperly dishonored these checks since there were sufficient funds to pay such checks in the Durbin's accounts. However, it is apparent from defendant's brief that they no longer press this contention. The stipulated facts and other evidence in the record also do not support such a claim.

reduced by an amount which could not have been realized" even if all notice requirements had been met. V.A.M.S. § 400.4–103(5). Defendants concede that with regard to the $24,000.00 check (Finding of Fact 28) and the $7,610.03 check (Finding of Fact 29), they could not have realized any greater amount even if plaintiff had wired its notice of dishonor, and therefore agree that they can show no damages. See Defendant's Suggested Conclusions of Law, p. 24. With regard to the $17,162.05 check, however, defendants do argue that they were damaged.

▮ Defendant's proof is essentially as follows: plaintiff received the check in question on August 11, a banking day. On the next banking day, August 13, the item was returned by mail. Since the bank closed at 3:00 p. m. in the afternoon, defendant argues that "wire notice of dishonor of this check should have been given no later than early afternoon." Later in that day, in the late afternoon or early evening, defendants issued Durbin their check for $11,008.93 from the proceeds of the cattle sale. Defendants state that "had plaintiff given the required wire notice of dishonor, we submit that it is reasonable to infer that defendants would have received notice thereof on the same date and in time to have notified plaintiff on that day of the stop payment of the $35,000.00 check in issue and to have withheld this $11,008.93 check." Accordingly, defendants argue that they are entitled to judgment on their counterclaim in the amount of $11,008.93.

We find defendants' position untenable. Under V.A.M.S. § 400.4–302, even as modified by the Federal Reserve letter, plaintiff was under no duty to wire its notice of dishonor until midnight on August 13. Defendant's theory of damage would require this Court to somehow find that this duty was breached by plaintiff's failure to send a wire notice in the early afternoon, apparently on the ground that under the Bank's own procedures notice should have been sent at that time. But plaintiff cannot be charged with liability for failure to comply with its own procedures. Liability does not arise until it fails to meet the requirements of law. In this case, that did not occur until midnight on August 13, hours after the defendants issued Durbin their check.

▮ Moreover, even if plaintiff had sent a wire notice by 3:00 p. m. on August 13, defendants have not shown that notice would have reached them in time to halt the issuance of the $11,008.93 check. Under the terms of the Federal Reserve letter, the plaintiff's wire notice of dishonor would be sent to the Oklahoma City Branch of the Kansas City Federal Reserve Bank. Notice would thereafter be sent back through the chain of endorsement, which in this case would include the Federal Reserve Bank of St. Louis, the Cornerstone Bank of Southwest City, Missouri, and ultimately, the defendants. There is no evidence in the record that this process could or would have occurred in the four to six hour period which defendants argue would have existed. Indeed, any finding to that effect would of necessity be sheer surmise, not a reasonable inference from the facts of the case. We therefore find that defendants would not have realized any additional recovery against the Durbins even if plaintiff had complied with the requirements of the Federal Reserve letter, and can thus demonstrate no damage.[7] Judgment on

---

7. Defendants have made the additional argument that the Court can infer "bad faith" on the part of plaintiff since the "only possible reason for [the failure to wire notice] would be to prevent defendants learning of the dishonor of the $17,162.05 check until after their $35,000 check had cleared." We reject this argument since there is no evidence to support a finding of bad faith. In fact, notice of dishonor of the $17,162.05 check did arrive before the $35,000 cleared. Defendant's argument also fails for the reasons stated above, since there is no proof that any of defendant's damages were a

defendants' counterclaim will accordingly be entered for plaintiff.

*Third-Party Complaint*

Defendants have filed a third-party complaint against the Durbins seeking to recover $48,772.08 for the three checks dishonored by plaintiff. The third-party defendants have answered by denying liability [8] and have signed Standard Pretrial Order No. 2. However, no brief was filed by said third-party defendants in support of their position.

It is settled law that the holder of an instrument has a right of recourse against the drawer when the instrument is dishonored. V.A.M.S. § 400.3–507(2). The stipulated record of this case disclosed no defense which the third-party defendants could raise with regard to third-party plaintiffs' rights under this provision on the checks in question. Judgment on the third-party complaint will be entered for the third-party plaintiffs in the amount of $48,772.08.

The Clerk is directed to forthwith enter judgment in accordance with this opinion.

---

proximate consequence of plaintiff's error. See V.A.M.S. § 400.4–103(5).

8. The third-party defendants also filed a cross-claim against the third-party plaintiffs, but later voluntarily dismissed that claim.