**COLORADO NATIONAL BANK,**
**Plaintiff,**

v.

**FIRST NATIONAL BANK & TRUST**
**CO., Defendant.**

**No. G 75–120 CA 7.**

United States District Court,
W. D. Michigan, S. D.

Nov. 9, 1978.

---

Richard M. Van Orden, Grand Rapids, Mich., for plaintiff.

Nathaniel W. Stroup, Petoskey, Mich., Roger M. Clark, Grand Rapids, Mich., for defendant.

## OPINION AND ORDER

MILES, District Judge.

Plaintiff, Colorado National Bank, brings this action against defendant, First National Bank & Trust Co., located in Petoskey, Michigan, to recover the face amount of two dishonored checks. Diversity jurisdiction is properly asserted under 28 U.S.C. § 1332.[1]

■ Presently before the court is plaintiff's motion for partial summary judgment, filed under F.R.Civ.P. 56(d),[2] as to the appropriate measure of damages. Stated simply, the court addresses the question whether defendant, by failing to give "wire advice of nonpayment" of dishonored checks, became "accountable" for the face amount of the checks, despite defendant's return of the checks through the mail before its "midnight deadline." In conjunction with the rule 56(d) motion, plaintiff moves for a preliminary ruling on the admissibility of evidence of actual damages under F.R.Ev. 104,[3] arguing that the appropriate measure of damages is the face amount of the checks.

### Check Collection Procedure

■ Article 4 of the Michigan Uniform Commercial Code[4] outlines the check collection procedure utilized by banks that are members of or participants in the Federal Reserve System. A review of this procedure is helpful in understanding the "return" and "wire advice of nonpayment" requirements referred to above.

The check collection process commences when a check is deposited for collection in a "depository" bank.[5] The process may involve a series of transfers between "intermediary"[6] and "collecting"[7] banks. Each bank in the collection process "settles" for the check by various means, including the payment of cash. The most common method of settlement consists of giving credit to the prior intermediary or collecting bank. M.C.L.A. § 440.4101, Official Comment 5. Settlements are "provisional" until "final payment." M.C.L.A. § 440.4201. Ultimate-

---

1. Jurisdiction is also asserted under 28 U.S.C. § 1348. Because the court unquestionably may assume jurisdiction under 28 U.S.C. § 1332, the question whether jurisdiction also exists under section 1348 is not addressed.

2. F.R.Civ.P. 56(d) states:
   (d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

3. The court has the authority to issue a preliminary ruling on the admissibility of evidence under F.R.Ev. 104 which provides:
   (a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of

evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

4. The parties agree that Article 4 of the Michigan Uniform Commercial Code, M.C.L.A. § 440.4101, et seq., represents the law governing the instant controversy. In addition, the UCC provides that the "liability of a bank for actions or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located." M.C.L.A. § 440.4102(2). Because defendant First National Bank & Trust Co. is located in Michigan, the law of this state is applicable.

5. A "depository" bank is defined as "the first bank to which an item is transferred for collection even though it is also the payor bank." M.C.L.A. § 440.4105(a).

6. An "intermediary" bank is defined as "any bank to which an item is transferred in the course of collection except the depository or payor bank." M.C.L.A. § 440.4105(c).

7. A "collecting" bank is defined as "any bank handling the item for collection except the payor bank." M.C.L.A. § 440.4105(d).

ly the check is presented to the bank upon which it is drawn, the "payor" bank,[8] which also makes a provisional settlement with the presenting bank. M.C.L.A. § 440.4213, Official Comment 4. Final payment by the payor bank "firms up" the provisional settlements made by the intermediary and collecting banks. M.C.L.A. § 440.4213, Official Comment 8.

Section 4–213 sets forth the methods by which a payor bank may make final payment:

(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) paid the item in cash; or

(b) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; or

(c) completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or

(d) made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing house rule or agreement.

M.C.L.A. § 440.4213.

Whether a payor bank has finally paid an item, then, depends on whether the bank executes any of the affirmative acts defined in subsections (a) to (c) of section 4–213(1). Where a bank does not act affirmatively under subsections (a) to (c), inaction, the failure to revoke a provisional settlement, constitutes final payment under subsection (d) of section 4 ·213(1).

Section 4–213(1)(d) states that the appropriate method to revoke a settlement is

defined by "statute, clearinghouse rule or agreement." Revocation by "agreement," in the form of Federal Reserve Regulations and operating circulars, will be discussed later in this opinion. (*See* discussion at p. 6, *infra* ). Section 4–301(1) relates the statutory method of revoking a settlement:

(1) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (subsection (1) of Section 4—213) and before its midnight deadline it

(a) returns the item; or

(b) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.

M.C.L.A. § 440.4301(1).

To revoke a settlement, therefore, the payor bank must return [9] the item before its midnight deadline, defined as "midnight on its next banking day following the banking day on which it receives the relevant item . . ." M.C.L.A. § 440.4104(h). Written notice of dishonor before the payor bank's midnight deadline constitutes revocation of a provisional settlement only where the item is unavailable. If the payor bank fails to take the action required within the time limits prescribed in section 4–301, the payor bank is deemed "accountable" for the amount of the item under section 4–302 [10] if it:

retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or re-

---

**8.** A "payor" bank is defined as "a bank by which an item is payable as drawn or accepted." M.C.L.A. § 440.4105(b).

**9.** An item is returned:

(a) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules; or

(b) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions.
M.C.L.A. § 440.4301(4).

**10.** Note that under section 4–213 a payor bank is accountable for an item upon "final payment." *See also,* M.C.L.A. § 440.4213, Official Comment 7.

turn the item or send notice of dishonor until after its midnight deadline. M.C.L.A. § 440.4302.

### Factual Background

In the instant controversy, the check collection procedure outlined above was followed. As of July 10, 1974 William C. Hester had a checking account with plaintiff, Colorado National Bank, and with defendant, First National Bank & Trust Co., in Petoskey, Michigan. On July 10, 1974 plaintiff received for deposit two checks drawn on and payable from Mr. Hester's account with defendant. One check, No. 205, was made out in the amount of $14,000. The other, No. 206, was made out in the amount of $18,700. Plaintiff forwarded these two checks to defendant, the payor bank, for payment through the Federal Reserve Bank in Denver, Colorado, and the Chicago Federal Reserve, Detroit Branch. Both checks were received by defendant on July 15, 1974. Defendant made a provisional settlement for the checks. Mr. Hester's checking account with defendant, however, contained insufficient funds to cover either check.

The parties have agreed, for purposes of the present motion for partial summary judgment only, that defendant returned the Hester checks through the United States mail on July 16, 1974, prior to its midnight deadline.

In addition to returning the Hester checks, however, defendant payor bank was also required to give "wire advice of nonpayment" pursuant to operating circulars issued by the Federal Reserve. The parties have agreed, again for purposes of the present motion for partial summary judgment only, that defendant failed to give wire advice of nonpayment. A determination of the present motion requires an interpretation of the wire advice requirement of the federal reserve.

### Federal Reserve Regulations and Operating Circulars

Section 4–103 of the Michigan Uniform Commercial Code provides that the provisions of Article 4 may be varied by agreement, M.C.L.A. § 440.4103(1), and that "Federal Reserve Regulations and Operating letters, clearinghouse rules, and the like, have the effect of agreements." M.C.L.A. § 440.4103(2). The parties agree that Federal Reserve Regulation J, 12 C.F.R. § 210.1 *et seq.*, entitled "Collection of Checks and Other Items by Federal Reserve Banks," and Operating Circulars Nos. 4 and 17 [11] are applicable to the instant controversy.

Federal Reserve Regulation J of the Board of Governors of the Federal Reserve System empowers Federal Reserve Banks to issue operating circulars "not inconsistent with this Subpart." 12 C.F.R. § 210.16. Operating Circular No. 17 requires that all paying and collecting banks give "wire advice of nonpayment" of all dishonored items of $2500 or over.[12] Wire advice must be

11. Operating Circular No. 17, entitled "Instructions to Collecting Banks and Paying Banks," instructs participating banks. Operating Circular No. 4, entitled "Collection of Cash Items," sets forth the terms and conditions under which the Chicago Federal Reserve Bank will handle items for collection. The wire advice provisions contained in Operating Circular No. 4 are substantially identical to those in Operating Circular No. 17. In the text of this opinion, therefore, the court refers only to the latter circular.

12. Operating Circular No. 17, paragraph 18 states:
   Except as provided in paragraph 19 hereof, all paying banks and collecting banks must receive, handle, and forward cash items in accordance with the following uniform instruc-

tions regarding protest and wire advice of nonpayment; and any contrary or special instructions noted on cash letters or otherwise transmitted with cash items are to be disregarded:
a. PROTEST any dishonored item of $2,500 or over:
   (1) which appears on its face to have been drawn at a place which is not within any State, unless it bears on its face the A.B.A. no-protest symbol of a Federal Reserve bank or of a preceding bank endorser, or
   (2) which bears on its face the legend, "PROTEST REQUIRED," of a Federal Reserve bank or of a preceding bank endorser.
b. DO NOT PROTEST:
   (1) any item of less than $2,500 or
   (2) any item of $2,500 or over unless it is protestable under subparagraph a.

given prior to the bank's midnight deadline. *See e. g., Bank of Wyandotte v. Woodrow,* 394 F.Supp. 550, 557 (W.D.Mo.1975); *Security Bank & Trust Co. v. Federal Nat'l Bank,* 554 P.2d 119, 19 UCC Rep. 211 (Okl.App. 1976).

### Damages

The issue presently before the court, as noted previously, is whether defendant, by failing to give "wire advice of nonpayment" of dishonored checks became accountable for the face amount of the checks[13] despite defendant's return of the checks through the mail before its "midnight deadline." (Brief of Plaintiff, at 10).

Plaintiff asserts that the "wire advice" requirement of operating Circular No. 17 is "incorporated  .   .   .   into the substantive language of section 4–302, and a payor bank, in order to escape strict liability for the face amount of the checks, must also give wire advice of nonpayment of items in excess of $2500 to the Federal Reserve before the midnight deadline." (Brief of Plaintiff, at 10).

Defendant argues that the "wire advice" requirement of Operating Circular No. 17 merely establishes a standard of "ordinary care" and that only actual damages may be imposed. (Brief of Defendant, at 23–24).

█ It is this court's observation that the issue of the appropriate measure of damages depends entirely on whether defendant "finally paid" the Hester checks under section 4–213(1)(d). Plaintiff concedes that defendant did not finally pay the checks under subsections (a) to (c) of section 4–213(1).

If defendant failed to revoke its provisional settlement of the Hester checks under section 213(1)(d), therefore, the checks must be deemed "finally paid" and defendant will be held "accountable" for the face amount of the checks under section 4–302. This approach is consistent with precedent interpreting the interaction between the final payment and accountability provisions of the UCC. In *Met Frozen Food v. National Bank of North America,* 89 Misc.2d 1033, 393 N.Y.S.2d 643 (Sup.Ct.1977), for example, the court observed that "[o]nce payment has been made it cannot be said that a payor bank's liability is anything other than the face amount of the instrument." *Id.* at 647.

As noted previously, an item is deemed finally paid under section 4–213(d) if the payor bank fails to revoke a provisional settlement. The "time and manner" by which a payor bank may revoke a settlement is defined "by statute, clearinghouse rule or agreement." Return of an item prior to the bank's midnight deadline is the primary statutory method of revocation stated in section 4–301. Implicit in plaintiff's position is the argument that Operating Circular No. 17 alters section 4–301 to permit revocation of a provisional settlement by wire advice of nonpayment in addition to or as a substitute for the return requirement. Also implicit under plaintiff's theory is the assertion that the circular alters section 4–302 to provide that payor banks are "accountable" for the face amount of an item for failure to give wire advice, despite compliance with the return requirement.

c.  WIRE ADVICE of nonpayment of any item of $2,500 or over, unless it has not been paid because of a missing, irregular, or unsatisfactory endorsement or unless it bears on its face the legend, "DO NOT WIRE NONPAYMENT," of a Federal Reserve bank or of a preceding bank endorser. Include in the advice of nonpayment, the amount of the item, the reason for nonpayment, the date of our cash letter, the name of the drawer or maker, and the names of all endorsers preceding the Federal Reserve bank or their A.B.A. transit numbers, if any.

d.  DO NOT WIRE ADVICE of nonpayment of:
   (1) any item of less than $2,500, or
   (2) any item of $2,500 or over unless such advice is required by subparagraph c.

13.  There is no doubt that, if defendant had failed to return the dishonored checks by its midnight deadline, liability for the face amount of the checks would be imposed. *Rock Island Auction Sales, Inc. v. Empire Packing Co.,* 32 Ill.2d 269, 204 N.E.2d 721 (1965); *Blake v. Woodworth Bank & Trust Co.,* 555 S.W.2d 589, 598–601 (Ky.App.1977); *Central Bank & Trust Co. v. First Northwest Bank,* 332 F.Supp. 1166 (E.D.Mo.1971), *aff'd,* 458 F.2d 511 (8th Cir. 1972).

The court has taken considerable time in studying the excellent briefs of the parties. Defendant's brief is particularly well-reasoned. The Court concludes that plaintiff's motion for partial summary judgment must be denied.

The most compelling reason underlying the court's decision is the absence of any indication in Operating Circular No. 17 that the harsh result urged by plaintiff was intended. First, several key terms used in the relevant UCC sections do not appear in the circular. The term "revoke," for example, utilized in sections 4–213(1)(d) and 4–301 which establish revocation of a provisional settlement as a means to avoid "accountability" for the face amount of an item, is not used in Operating Circular No. 17. In addition, the term "accountable," the operative term in section 4–302 which imposes liability for the face amount of a check on payor banks for failure to return an item does not appear in Operating Circular No. 17.

The court also notes that the wire advice requirement imposed by Operating Circular No. 17 does not make a distinction between the liability of payor banks as opposed to collecting and intermediary banks. The circular applies to "paying banks *and collecting banks.*" [14] (Emphasis added). Sections 4–301 and 4–302, however, impose liability for the face amount of a check only on payor banks upon final payment.

■ By incorporating into Operating Circular No. 17 the terms "revoke" and "accountable" and by distinguishing between the liability of payor as opposed to other banks, the Federal Reserve could have indicated clearly an intent to establish "wire advice of nonpayment" as a means of revoking a provisional settlement and to hold payor banks "accountable" for the face amount of an item for failure to give wire advice. The absence of the language noted above indicates that the Federal Reserve did not intend the result urged by plaintiff.

14. Note that Operating Circular No. 4 also does not differentiate between payor and other banks. Operating Circular No. 4 provides that

■ The significance of the omissions by the Federal Reserve is highlighted when the central importance of the "final payment" step of the check collection procedure is considered:

Final payment of an item is important for a number of reasons. It is one of several factors determining the relative priorities between items and notices, stop-orders, legal process and set-offs (Section 4—303). It is the "end of the line" in the collection process and the "turn around" point commencing the return flow of proceeds. It is the point at which many provisional settlements become final. See Section 4—213(2). Final payment of an item by the payor bank fixes preferential rights under Section 4—214(1) and (2).

M.C.L.A. § 440.4213, Official Comment 1.

The court cannot interpret Operating Circular No. 17 as altering the acts or inaction which constitute final payment under the UCC in the absence of language clearly indicating such an intent on the part of the Federal Reserve.

■ Language in Regulation J further suggests that the result urged by plaintiff was not intended. As noted above, Regulation J authorizes Federal Reserve Banks to issue operating circulars "not inconsistent with this Subpart." In addition, Operating Circular No. 17 states that the circular was issued "in conformity with the provisions of Regulation J . . . ." (Operating Circular No. 17, para. 2). Defendant, however, points out that Regulation J does not vary the "return" or the "accountability" provisions of sections 4–301 and 4–302, respectively. Regulation J provides that:

(a) A *paying bank* that receives a cash item from or through a Federal Reserve Bank, otherwise than for immediate payment over the counter, and that pays or remits for such item as provided in

the wire advice requirement applies to "all Federal Reserve Banks." Operating Circular No. 4, para. 20.

§ 210.9(a) *shall have the right to recover any payment or remittance so made, if before it has finally paid the item, it returns the item before midnight of its banking day next following the banking day of receipt* or takes such other action to recover such payment or remittance within such time and by such means as may be provided by applicable State law.

12 C.F.R. § 210.12(a) (Emphasis added).

Similarly, Operating Circular No. 17 states:

*If a paying bank returns to us an unpaid cash item in accordance with the provisions of section 210.12 of Regulation J, it may recover any payment or remittance theretofore made by it* for such item by requesting a credit therefor to an account on our books; and paying banks are urged to follow this procedure to the extent practicable. However, any such paying bank may return any such unpaid item to us for refund.

Operating Circular No. 17, paragraph 10 (Emphasis added).

In sum, Regulation J and Operating Circular No. 17 provide that a payor bank is not accountable for the face amount of an item if, before its midnight deadline, the item is returned. Under plaintiff's theory a payor bank would be accountable for the face amount of an item if, before its midnight deadline, the bank failed to give wire advice, despite the bank's compliance with the return requirement of section 4–301. Plaintiff's interpretation of Operating Circular No. 17 is inconsistent and not in conformity with Regulation J.[15]

A payor bank is "accountable" for the face amount of an item upon final payment. The wire advice requirement of Operating Circular No. 17 does not constitute a substitute for or an alternative to "return" of an item as the primary method of revoking a settlement. Defendant properly returned the Hester checks prior to its midnight deadline and, therefore, did not finally pay the checks. Because the checks were not finally paid, section 4–302 is inapplicable to the instant controversy.

■ Having explained why payor banks are not accountable for the face amount of an item under the facts presented in this case, the question of the appropriate measure of damages to apply remains. As noted above, section 4–103 provides that the terms of Article 4 may be varied by agreement and that regulations and operating circulars have the effect of agreements. Section 4–103 also contains provisions stating that regulations and operating circulars establish the standard of ordinary care in the banking industry and defining the measure of damages when a bank breaches that standard. The relevant portion of section 4–103 states:

(3) Action or non-action approved by this article or pursuant to Federal Reserve regulations or operating letters constitutes the exercise of ordinary care and, in the absence of special instructions, action or non-action consistent with clearing house rules and the like or with a general banking usage not disapproved by this article, prima facie constitutes the exercise of ordinary care.

---

15. The court also questions whether Regulation J authorizes Federal Reserve banks to issue operating circulars which alter the provisions of the UCC. Regulation J states that:

Each Federal Reserve bank shall issue operating letters (sometimes referred to as operating circulars or bulletins), not inconsistent with this Subpart, governing the details of its operations in the handling of cash items and noncash items, and containing such other matters as are required by the provisions of this Subpart. Such letters may, among other things, classify cash items and noncash items, require separate sorts and letters, and

provide different closing times for the receipt of different classes or types of cash items and noncash items.

12 C.F.R. § 210.16.

The language of the regulation implies that operating circulars may be issued for the limited purpose of establishing "details" of internal operations.

Section 4–103(1) and (2), however, provides that agreements, in the form of operating circulars, may alter the provisions of the UCC.

The court notes, but does not decide, the above issue.

. . . . .

(5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.

The proper measure of damages applicable in the instant controversy is stated at section 4–103(5).

The only other court which has considered the issue addressed herein, *Bank of Wyandotte v. Woodrow*, 394 F.Supp. 550 (W.D.Mo.1975), is in agreement with this court's conclusion. In *Woodrow*, as in the instant case, the payor bank made a timely physical return of a dishonored item. The court found, however, that the bank failed to give wire advice of nonpayment as required by the applicable Federal Reserve Operating Circular. *Id.* at 553. With respect to the issue of the appropriate measure of damages the court stated:

> The measure of damages in situations such as this is "the amount of the item reduced by an amount which could not have been realized" even if all notice requirements had been met. V.A.M.S. § 400.4–103(5).

*Id.* at 556–57.

The court concluded that plaintiff would not have recovered any greater amount even if the payor bank had complied with the wire advice requirement, and therefore, had not been damaged. *Id.* at 557.

For the reasons set forth above, plaintiff's motion for partial summary judgment must be and hereby is denied. Evidence of actual damages will not be excluded at trial.

IT IS SO ORDERED.