**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0730n.06

**No. 11-2575**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Aug 08, 2013*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| SEAWAY COMMUNITY BANK, ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | ON APPEAL FROM THE UNITED |
| ) | STATES DISTRICT COURT FOR |
| ) | THE EASTERN DISTRICT OF |
| PROGRESSIVE CASUALTY INSURANCE ) | MICHIGAN |
| COMPANY, ) | |
| ) | |
| Defendant-Appellant. ) | |

Before: MARTIN, SILER, and DONALD, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge. This appeal involves Progressive Casualty Insurance Company's refusal to pay its insured, Seaway Community Bank, based on an exclusion in the bankers' bond agreement into which they entered. Under Michigan law, which applies in this diversity action, courts must construe ambiguous exclusionary clauses strictly in favor of the insured. Exclusion (o) of the bankers' bond stated that Progressive did not have to compensate Seaway for a loss resulting from checks that were not "finally paid," but Exclusion (o) did not specify that checks drawn upon Canadian banks were excluded. Applying Michigan's version of the Uniform Commercial Code, the checks were finally paid because the midnight-deadline rule applied. We therefore **AFFIRM** the district court's judgment in favor of Seaway.

Seaway, a Michigan-based bank, bought a Financial Institutions Bond (also called a blanket bond) from Progressive, an Ohio-based insurer. The Bond was a form contract: it stated at the top that it was "Standard Form No. 24." The American Bankers Association and the American Surety Association jointly drafted Standard Form No. 24. *See Oritani Sav. and Loan Ass'n v. Fidelity and Deposit Co. of Maryland*, 989 F.2d 635, 643 (3d Cir. 1993). Neither Seaway nor Progressive modified the boilerplate language in the Bond.

The Bond provided coverage for losses caused by forged checks. Insuring Agreement (D) of the Bond, "Forgery or Alteration," provided coverage for: "Loss resulting directly from the Insured [Seaway] having, in good faith, paid or transferred any Property in reliance on any Written, Original (1) Negotiable Instrument . . . which . . . is altered, but only to the extent the alteration causes the loss."

The Bond excluded coverage for checks that were not "finally paid." Exclusion (o) provided that the Bond excluded coverage for "loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit *which are not finally paid* for any reason, including but not limited to Forgery or any other fraud. . ." (emphasis added).

A Seaway customer deposited three checks, made payable to him through a Canadian bank, into his Seaway account: $66,672.13, deposited on October 26, 2009; $88,474.83, deposited on November 11, 2009; and $228,945.05, deposited on December 3, 2009. Seaway allowed the customer to withdraw the proceeds from the three checks from his account.

Unbeknownst to Seaway, however, the checks had been fraudulently altered. Before the Seaway customer received them, someone had deleted the original payee and inserted the Seaway

customer's name as the payee. The Canadian bank, the payor of the checks, returned the three checks to Seaway on December 13, 2009; December 18, 2009; and January 18, 2010 and the provisional credits were reversed. Seaway alleged it lost (after the right of offset) $375,412.19.

Seaway notified Progressive of the loss, and, in February 2010, submitted a proof of claim to Progressive. But Progressive denied the claim on the basis of the Bond's Exclusion (o), claiming that the checks were not "finally paid," because checks from Canadian banks are provisional and subject to reversal—i.e., not "finally paid." For this reason, Progressive claimed, Exclusion (o) applied.

Seaway sued Progressive for coverage. The district court had jurisdiction over this case based on diversity of the parties. 28 U.S.C. § 1332(a). Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). After a hearing, the district court entered an order, without a written opinion, granting Seaway's motion for judgment on the pleadings and denying Progressive's motion for judgment on the pleadings. Progressive timely appealed.

We review motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) under the same de novo standard as we review motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005)).

A federal court sitting in diversity must apply the choice of law provisions of the forum state. *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6th Cir. 2009) (citing *NILAC Int'l Mktg. Group v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004)). Given that Seaway filed this

case in Michigan state court, and that it was removed to the Eastern District of Michigan, Michigan choice of law provisions apply. *Id.* Specifically, we apply Article 4 of the Michigan Uniform Commercial Code, Mich. Comp. Laws Ann. § 440.4101 *et seq.* It provides that the "'liability of a bank for actions or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located.'" *Colorado Nat'l Bank v. First Nat'l Bank & Trust Co.*, 459 F. Supp. 1366, 1368 n.4 (W.D. Mich. 1978) (quoting Mich. Comp. Laws Ann. § 440.4102(2)).

We begin by outlining the check-collection procedure that banks use. We then apply it to this case's facts. Article 4 of the Michigan Uniform Commercial Code describes the check-collection procedure used by banks which are members of or participants in the Federal Reserve System. *Id.* The check-collection process begins when a customer deposits a check for collection in a "depository" bank, defined as "'the first bank to which an item is transferred for collection even though it is also the payor bank.'" *Id.* at 1368 n.5 (quoting Mich. Comp. Laws Ann. § 440.4105(a)). Here, Seaway was the depository bank. Seaway paid its customer, and then it sought payment on each check he had deposited by transferring each of them through one or more "intermediary" banks, defined as "'any bank to which an item is transferred in the course of collection except the depository or payor bank.'" *Id.* at 1368 n.6 (quoting Mich. Comp. Laws Ann. § 440.4105(c)). Each bank in the collection process "settles" for a check by various means, including by paying cash. *Id.* at 1368. Giving credit to the prior intermediary bank is the most common method of settlement. *Id.* (citing Mich. Comp. Laws Ann. § 440.4101, Official Comment 5). In other words, each intermediary bank that transfers the check to the next intermediary bank receives a provisional credit from the

transferee, with the penultimate intermediary bank in the collection chain receiving its provisional credit from the bank upon which it was drawn, called the "payor" bank, which means "'a bank by which an item is payable as drawn or accepted.'" *Id.* at 1369 n.8 (quoting Mich. Comp. Laws Ann. § 440.4105(b)). Here, the payor bank for each of the checks was a Canadian bank.

To revoke a settlement, the payor bank must return the item before its midnight deadline, defined as "midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." Mich. Comp. Laws Ann. § 440.4104(j). If the payor bank decides not to finally pay the check—perhaps because it is fraudulent—then these provisional credits are reversed. Whether the payor bank decides to finally pay the check or dishonor it, under Article 4 of the Uniform Commercial Code, the payor bank must take action before midnight on the next banking day following the banking day on which the payor bank receives the check. This is known as the "midnight deadline" rule. *See* Mich. Comp. Laws Ann. § 440.4302(1). Under the midnight deadline rule, if the payor bank receives a check and does nothing by midnight on the following banking day, then the bank must pay the check.

Here, the checks from the Canadian payor bank were "finally paid" as that phrase is defined in the Uniform Commercial Code. Progressive states that the Uniform Commercial Code, and the midnight deadline rule, do not apply to Canadian banks. Therefore, the Canadian payor bank in this case could—and did—decide days after receiving the checks from the collecting bank that it was going to dishonor the checks because they were fraudulent. The Canadian bank reversed the provisional credits all the way down the chain to Seaway. Because the fraudulent checks at issue

in this case could never be "finally paid," Progressive argues, they fall under Exclusion (o), which provided that Progressive did not have to pay Seaway for losses incurred on checks not "finally paid." The phrase "finally paid" has a clear meaning within the banking industry: it means when the midnight-deadline rule applies under the Uniform Commercial Code.

Under Michigan law, an insured loses coverage under a policy if one of the policy's exclusions applies to the insured's particular claims. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992) (citing *Fresard v. Michigan Millers Mut. Ins. Co.*, 327 N.W.2d 286, 289 (Mich. 1982)). Nevertheless, "[e]xclusionary clauses in insurance policies are strictly construed in favor of the insured." *Id.* (citing *Shelby Mut. Ins. Co. v. United States Fire Ins. Co.*, 162 N.W.2d 676, 678 (Mich. Ct. App. 1968)). We must give effect only to "[c]lear and specific exclusions." *Id.* We may not hold an insurance company liable for a risk that it did not assume. *Id.* (citing *Kaczmarck v. La Perriere*, 60 N.W.2d 327, 330 (1953)). But it is possible to hold an insurance company liable for a risk that it did assume, especially given that we must strictly construe an exclusionary clause in the insured's favor. We must construe an ambiguity in an insurance contract against the insurer and in favor of coverage. *Wielinga v. Am. Way Life Ins. Co.*, 473 N.W.2d 730, 731 (Mich. Ct. App. 1991) (citing *Auto Club Ins. Ass'n v. DeLaGarza*, 444 N.W.2d 803, 806 (Mich. 1989)).

We must construe Exclusion (o) strictly—in Seaway's favor and in favor of coverage. The Exclusion does not say whether or not checks drawn on Canadian banks are to be exempted from Michigan's version of the Uniform Commercial Code's definition of "not finally paid." Applying

the Uniform Commercial Code, the checks were finally paid.  Therefore, Exclusion (o) could not

apply, and Progressive must indemnify Seaway.  We **AFFIRM** the district court's judgment.

No. 11-2575
*Seaway Community Bank v. Progressive Casualty Insurance*

**BERNICE B. DONALD**, Circuit Judge, dissenting.


While I agree that under Michigan's choice-of-law rules, Michigan law applies, I do not agree that we can apply the Michigan Uniform Commercial Code to this case because application of the Michigan Uniform Commercial Code is limited. Michigan law makes clear that the Michigan Uniform Commercial Code only applies to "banks that are members of or participants in the Federal Reserve System." *Colo. Nat'l Bank v. First Nat'l Bank & Trust Co.*, 459 F. Supp. 1366, 1368 (W.D. Mich. 1978). The statutory canon *expressio unius est exclusio alterius* (the mention of one thing is the exclusion of another) is instructive here. *Marx v. Gen. Revenue Corp.,* 133 S. Ct. 1166, 1175 (2013) (recognizing that the *expressio unius est exclusio alterius* canon applies when it is "fair to suppose that Congress considered the unnamed possibility and meant to say no"); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (same); *Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702, 706 (6th Cir. 2009) (same). Only members or participants of the Federal Reserve System are covered by the Michigan Uniform Commercial Code. Canadian banks, like the one on which the fraudulent checks were written, are not members or participants of the Federal Reserve System and, therefore, are not covered by the Code. This negative inference is bolstered by the fact that other courts recognize that what qualifies as final payment varies with foreign instruments, and that final payment is not determined by the Uniform Commercial Code adopted in that state. *See generally*, *Mercantile Bank & Trust Co. v. Hunter*, 501 P.2d 486 (Colo. App. 1972) (determining that a check drawn on a British bank and returned 129 days after its deposit was provisional); *Gossels v. Fleet Nat'l Bank*, 902 N.E.2d 370, 374 (Mass. 2009) (determining that a check drawn on a Grand Cayman bank and returned twenty-one days after its deposit was provisional); *Cumis Mut. Ins. Soc'y, Inc. v. Rosol*,

2011 WL 589397 (N.J. Super. Ct. App. Div. Feb. 22, 2011) (finding that a check drawn on a Canadian bank and returned twenty-four days after its deposit was provisional). As such, what triggers final payment in this case is not governed by the Michigan Uniform Commercial Code or the midnight deadline rule in M.C.L. § 440.4302.[1]

Therefore, we properly turn to Michigan common law to interpret the bond provisions. *Bituminous Cas. Corp. v. J&L Lumber Co., Inc.*, 373 F.3d 807, 815 (6th Cir. 2004) (determining that state law applies to the interpretation of insurance contracts); *Morley v. Auto. Club of Mich.*, 581 N.W.2d 237, 240 (Mich. 1998) (holding that the construction and interpretation of an insurance contract is a question of law). Generally, rules of contract construction apply when interpreting insurance policies. *Universal Image Prod., Inc. v. Chubb Corp.*, 703 F. Supp. 2d 705, 707 (E.D. Mich. 2010). A fidelity insurance bond, however, is not a typical insurance policy. *Flagstar Bank, FSB v. Fed. Ins. Co.*, No. 05-70950, 2006 WL 3343765, at *2 (E.D. Mich. Nov. 17, 2006), *aff'd*, 260 F. App'x 820, 820–825 (6th Cir. 2008). Rather, it is the product of a collaborative effort between the underwriter and the insured financial institution. *Id.* The standard form bond at issue here has been designed to deter courts from interpreting coverage broader than intended by the parties. *See id*. Where the policy language is clear, a court must enforce the specific language of the contract and not create ambiguity where none exists. *See also Pac. Emp'rs Ins. Co. v. Mich. Mut. Ins. Co.*, 549 N.W.2d 872, 875 (Mich. 1996); *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 505 (Mich.

---

[1] A payor bank is accountable for a demand item presented on and received by the bank "whether properly payable or not if the bank . . . retains the item beyond midnight of the banking day of receipt without settling for it or . . . does not pay or return the item or send notice of dishonor until after its midnight deadline." M.C.L. § 440.4302.

1995); *see also First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 977 (7th Cir. 2007) (acknowledging that the traditional rule of construing any ambiguity in favor of coverage does not apply because the standard fidelity bond is drafted by representatives from both the banking and insurance industries). The policy as I read it is clear. The provisional payments for the three Canadian checks were properly revoked and never became final; thus, they were not finally paid.[2]

Moreover, we must only enforce those obligations actually assented to by the parties. *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 787 (Mich. 2003). Foreign checks pose a greater risk than domestic checks due to the fact that foreign checks are not subject to the Uniform Commercial Code's midnight deadline rule. *See generally EEOC v. Regions Fin. Corp.*, No. H-07-2491, 2010 WL 173371, at *2-3 (S.D. Tex. Jan. 12, 2010). The American Bankers Association, which co-drafted the Bond, explains:

> [F]oreign banks, such as Canadian banks, are not subject to the UCC or the Federal Reserve CC. Instead, Canadian banks' right to revoke settlement may be as long as one year from the date that the item is discovered as fraudulent, regardless of when the fraud is discovered. Because the discovery period can be indefinite, an item is never finally paid like domestic items. Therefore, foreign checks, are unavoidably subject to Exclusion (o) of the Financial Institution Bond. The Foreign Check Rider remedies this issue.

*See* ABA Insurance Services, Foreign Check Rider, available at http://www.abais.com/1foreign-check-rider.aspx.

---

[2] The Bond expressly excludes from coverage losses resulting from payments made or withdrawals from a depositor's account involving items of deposit that are not "finally paid." ("[T]his bond does not cover: . . . (o) loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid, for any reason. . . .") Canadian, unlike domestic, instruments can always be reversed in the instance of fraud. 1-8A Doing Business in Canada § 8A.01(c), (g).

Progressive did not agree to cover such risk, and Seaway failed to negotiate a Foreign Check Rider to provide the coverage that it now improperly seeks. As the Eastern District of Michigan observed in another case involving the application of an exclusion in a financial institution bond modeled after Standard Form 24, "Both [the insured bank] and [the insurer] are large, sophisticated financial institutions. They are well aware of the risks of the transactions in which they are involved and can easily bargain with each other to allocate those risks." *Flagstar Bank, FSB*, 2006 WL 3343765, at *2. Seaway failed to bargain for insurance coverage for fraudulent Canadian checks. We simply cannot rewrite an insurance policy under the guise of interpretation. *McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525, 531 (Mich. Ct. App. 2001).

For this reason, I would hold that the bond does not provide coverage in this situation. I am concerned that the majority's opinion essentially condones a court's rewriting of the terms of the fidelity insurance bond, and could render meaningless the terms of other similar bonds where banks negotiated and paid for foreign check coverage. In the present case, Seaway receives a gifted windfall as a resulted of a judicially revised insurance policy. For these reasons, I respectfully dissent.